**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**
**www.flsb.uscourts.gov**

In re:                                                    Chapter 11

**AVENTURA HOTEL PROPERTIES, LLC,**          **Case No. 21-12374-BKC-RAM**
**TRIPTYCH MIAMI HOLDINGS, LLC,**            **Case No. 21-12375-BKC-RAM**

        **Debtors.**                          **Jointly Administered Under**
_____/         **Case No. 21-12374-BKC-RAM**

**DEBTORS' MOTION FOR ENTRY OF AN ORDER**
**(A) AUTHORIZING THE SALE OF REAL PROPERTY OF THE CHAPTER 11**
**ESTATES FREE AND CLEAR OF LIENS, CLAIMS AND ENCUMBRANCES**
**PURSUANT TO 11 U.S.C. §363; (B) ESTABLISHING**
**BIDDING PROCEDURES AND SALE PROCESS; (C) APPROVING**
**ASSET PURCHASE AGREEMENT WITH INTEGRA REAL ESTATE, LLC;**
**(D) SCHEDULING SALE HEARING; AND (E) GRANTING RELATED RELIEF**

AVENTURA HOTEL PROPERTIES, LLC ("AHP") and TRIPTYCH MIAMI HOLDINGS, LLC ("TMH," and collectively, the "Debtors" or "Debtors-In-Possession") pursuant to §§105 and 363 of Title 11 of the United States Code (hereinafter the "Bankruptcy Code"), Rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Local Rule 2002-1, 6004-1, 6006-1 and 9014-1, file this *Motion for Entry of an Order (A) Authorizing the Sale of Real Property of the Chapter 11 Estate Free and Clear of Liens, Claims and Encumbrances Pursuant to 11 U.S.C. §363; (B) Establishing Bidding Procedures and Sale Process; (C) Approving Asset Purchase Agreement with Integra Real Estate, LLC; (D) Scheduling Sale Hearing; and (E) Granting Related Relief* (the "Motion").

Pursuant to the Motion, the Debtors request the Court set a hearing on the Motion to approve the Contract (as defined herein) (the "Approval Hearing") and seek entry of an Order establishing bidding procedures for the solicitation of higher and better offers and to conduct an auction sale in accordance with the Bidding Procedures (defined herein) set forth in Section IV

of this Motion and granting the relief described herein including, but not limited to, setting a hearing to approve a sale of the Property (as defined herein) pursuant to §363 of the Bankruptcy Code (the "Sale Hearing").

## I.      **INTRODUCTION**.

The Debtors' principal asset is approximately one acre of vacant land at 3601 N. Miami Avenue, at the intersection of Miami's Wynwood, Midtown and Design District neighborhoods the "Property"). The Debtors sought to develop a 475,000 square foot 3-unit condominium mixed-use project having (a) a 297- bedroom full-service lifestyle hotel, (b) approximately 40,000 square feet of premium retail space and 60,000 square feet of AAA office space, and (c) a structured parking garage with approximately 400 parking spaces.

By this Motion, the Debtors request Court authority to sell the Property to Integra Real Estate, LLC or its assign ("Integra"), a Miami-based private equity and full service real estate development company, subject to higher and better offers.  Integra has agreed to pay **$25.5 million** for the Property, without any financing or appraisal contingencies, subject to the expiration of a due diligence period and the approval of the sale by the Bankruptcy Court pursuant to §363 of the Bankruptcy Code.  Attached as Exhibit A is copy of the Contract between Debtor AHP and Integra.

To date, the Contract represents the strongest offer that was received by the Debtors after a comprehensive sale process led by the Debtor's court-approved real estate broker.  The proposed sale of the Property is subject to higher or better offers and, if any such offers are received or if Integra terminates the Contract at the expiration of the due diligence period, the Debtors request that the Court conduct an absolute auction at a final sale hearing and authorize the sale of the Property at such hearing to the successful bidder in accordance with the proposed bidding procedures outlined in this Motion.  The Debtors respectfully request the Bankruptcy

Court conduct the auction and final sale hearing on or before **August 23, 2021.**

## II.     JURISDICTION, VENUE AND STATUTORY AND PROCEDURAL BASIS.

1.       The Court has jurisdiction over this matter pursuant to 28 U.S.C. §1334. This is a core proceeding pursuant to 28 U.S.C. §157(b)(2)(A). Venue is proper pursuant to 28 U.S.C. §§1408 and 1409. The statutory predicates for the requested relief are §§105(a), 363(b), (f), (k), and (m), and 365(a) of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006 and 9014 and Local Rules 2002-1, 6004-1, 6006-1 and 9014-1.

## III.     BACKGROUND.

### A.     The Debtors' Pre-Petition Business.

2.       In July 2014, Debtor AHP acquired the Property for purposes of developing the Property into a project generally knowns as the Triptych Project.  Debtor TMH owns 100% of the membership interests of Debtor AHP.

3.       On July 31 2018, LV Midtown, LLC ("Secured Creditor") extended a loan (the "LV Loan") in the original principal amount of $15,000,000 (the "Loan Transaction").  The Loan is secured by, among other things, a first priority mortgage against the Property.  The LV Loan is also secured by a pledge by TMH of 100% of the membership interests in AHP, pursuant to the terms of a Pledge and Security Agreement dated July 31, 2018 (the "Pledge Agreement").

4.       In connection with the LV Loan, AHP also executed a Redemption Agreement with QR Triptych, LLC ("QR Triptych") (the "Redemption Agreement") that provided for AHP to redeem all of QR Triptych's interests in AHP in exchange for (i) payment of $3 million from the proceeds of the LV Loan; and (ii) AHP executing a promissory note in  the  original principal amount of $8,238,579 (the "QR Note").

5.       The Property is the subject of a pending foreclosure lawsuit commenced by the Secured Creditor on September 20, 2020, in the matter styled: *LV Midtown, LLC v. Aventura*

*Hotel Properties, LLC, et al.*, Case No.: 2020-018857-CA-23 (the "Foreclosure Case") in the Circuit Court of the 11th Judicial Circuit in and for Miami-Dade County Florida (the "State Court").

**B.**    **The Debtors' Bankruptcy Case.**

6.    On March 12, 2021 (the "Petition Date"), the Debtors filed voluntary petitions in this Court for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") and, as a result, the Foreclosure Case has been stayed since the Petition Date by operation of section 362 of the Bankruptcy Code.

7.    On March 15, 2021, the Court granted the Debtors' *Ex-Parte* Motion for Joint Administration [ECF No. 11], providing for the designation of Case No. 21-12375-BKC-RAM as the "Lead Case." To date, a creditors' committee, trustee or examiner has not been appointed in this case. The Debtors are operating and managing the business and affairs of their respective bankruptcy estates (the "Estates") as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

8.    On May 19, 2021, the Secured Creditor filed a secured claim, Claim No. 5-1, in an amount not less than $18,944,582.14, plus accrued interest, attorneys' fees and costs as of the Petition Date (the "Secured Claim") in the Bankruptcy Case.

9.    On May 19, 2021, QR Triptych, LLC ("QR Triptych") filed Claim No. 6-1 [Debtor AHP] (the "QR Claim"). The QR Claim asserts a claim against AHP in the amount of $8,238,579.20, and purports to be secured by a subordinate mortgage on the Property. However, the QR Claim does not contain evidence of AHP's alleged indebtedness to QR Triptych and instead relies upon a promissory note evidencing only indebtedness to LV Midtown.

10.    On June 15, 2021, the Debtors commenced an adversary proceeding against QR

Triptych and JQ Real Estate, LLC.  *See* Adv. Case No. 21-12374-RAM (the "Avoidance Litigation").  The Avoidance Litigation was filed to avoid certain inequitable transactions made for the benefit of QR Triptych - a former equity investor in Debtor TMH – that were paid from the assets of Debtor AHP.  In summary, the Debtors seek to avoid (i) $2.2 million transferred by Debtor AHP to Defendant JQRE (an entity related to QR Triptych and to which the Debtors were not indebted); (ii) $3 million transferred by Debtor AHP to Defendant QR Triptych on account of its equity in Debtor TMH; and (iii) the incurrence by Debtor AHP of an $8.2 million subordinated mortgage in favor of Defendant QR Triptych in exchange for nothing of value to Debtor AHP. The Debtors also objected to QR Triptych's filed proof of claim and seek mandatory and equitable subordination.

11.    On June 16, 2021, the Court approved a settlement between the Debtors and the Secured Creditor [ECF No. 85] (the "LV Settlement")[1] that provides, among other things for:

(a) The allowance of Secured Creditor's Secured Claim in the amount of $20,468,837.91 as of September 15, 2021 (the "Payoff Amount").

(b) Notwithstanding the stipulated Indebtedness and Payoff Amount, the Secured Creditor shall agree to accept a discounted lump sum amount of $19,600,000 ("Release Price") in full and final satisfaction of the Secured Claim against the Estates under 11 U.S.C. § 506 of the Code provided that (a) such Release Price is indefeasibly paid to and actually received by Secured Creditor in cleared funds on or before September 15, 2021, (b) each of the milestones identified in the LV Settlement are completed; and (c) and the Debtors have timely complied with each and every term of the LV Settlement.

(c) In consideration to the Estates for the compromise of alleged defenses to the claim of the Secured Creditor and for the timely sale and/or liquidation of the Property (as set forth in the LV Settlement), the Secured Creditor consented to a carve-out/surcharge from the Payoff Amount in favor of the bankruptcy estate of Debtor AHP in the amount of $800,000.00 (the "Surcharge Contribution") solely to the extent of available cash proceeds in excess of the Release Price, for the benefit of the Debtors

---

[1] Please refer the Debtors' *Expedited* Motion to Approve Settlement and Compromise with LV Midtown, LLC [ECF No. 55] and the Order Approving the LV Settlement [ECF No. 85] for a complete description of the LV Settlement.

bankruptcy estates (i.e., for the payment of administrative expenses and for distribution to general unsecured creditors). Further, Secured Creditor agreed to a reduction of the Payoff Amount by $68,837.91 (the "Settlement Reduction"), which Settlement Reduction is reflected in the Release Price and Secured Creditor waived any right to assert such amount against the Estates or against any third party (subject to the terms of the LV Settlement).

(d) Further, the Release Price was determined to be the full amount of Secured Creditor's credit bid under 11 U.S.C. § 363(k) or otherwise (the "Credit Bid") with respect to any sale process in respect of the Property that complies with the LV Settlement and that actually closes on or before September 15, 2021.

### C.    The Proposed Sale of the Property.

12.    The Debtors scrutinized proposals from leading international brokerages to facilitate the marketing and sale of the Property.   On April 26, 2021, the Debtors reached an agreement to broker the sale of the Property John Crotty and Avison Young-Florida, LLC ("Avison Young").

13.    On June 1, 2021, the Court granted the Debtors' Motion to Employ Avison Young and approved the Exclusive Sales Listing Agreement with the Avison Young (the "Listing Agreement") [ECF No. 53].

14.    Pursuant to the terms of the Listing Agreement, Avison Young assisted the Debtors in marketing and selling the Triptych Project by: (i) preparing a marketing program; (ii) preparing descriptive marketing materials; (iii) providing advice and assistance in structuring the offering price and sales terms; (iv) exercising reasonable efforts to procure a buyer for the Triptych Project; (v) negotiating, in coordination with Debtors' representatives, the terms and conditions of the sale of the Triptych Project; and (v) distributing marketing information on the Triptych Project to co-brokers.

15.    The Listing Agreement provides for Avison Young to receive a brokerage fee in the amount of 150 basis points (1.50%) of the gross sales price of the Triptych Project (collectively, the "Commission").   In order to facilitate lender approval, Avison Young agreed to

waive any commission due or cost advanced by it under the Listing Agreement if the purchase price did not exceed the Release Price.

16.     Upon its retention, Avison Young developed a sales and marketing process and made a call for interested buyers to submit offers on or before June 24, 2021.  In the course of the sales process, Avison Young contacted and marketed the property to over 14,000 hospitality investors, 6,300 potential investors through the Real Clear Markets platform, 2,100 developers, and 1,110 outside brokers.  The marketing efforts resulted in over 3,200 CoStar listing page visits and the execution of 59 confidentiality agreements by potential buyers.

17.     After the expiration of the call for offers, the Debtors analyzed all offers received for the purchase of the Property.  In consultation with Avison Young and counsel, the Debtors exercised their business judgment to advance negotiations for the sale of the Property to Integra.

18.     On July 15, 2021, AHP and Integra entered into the Contract for the "As Is" Sale and Purchase of Vacant Land, pursuant to the terms set forth herein below and Exhibit "A"  (the "Contract").  Pursuant to the Contract, Integra's deadline to complete all due diligence with respect to purchase of Property is Saturday, August 14, 2021 (the "Due Diligence Deadline").

## IV.     PROPOSED SALE TRANSACTION, BIDDING PROCEDURES AND SALE PROCESS.

### A.     Terms of the Proposed Sale Transaction with Integra.

19.     The Debtors intend to sell the Property to Integra pursuant to the Contract or to the successful bidder at an auction sale through the sale process described in this Motion, consistent with the due process requirements of the Bankruptcy Code and Bankruptcy Rules. The Contract should be consulted for the actual terms of the sale. In the event of a conflict, the terms of the Contract control, but is summarized below for ease of reference.

**Seller**: Aventura Hotel Properties, LLC

**Purchaser**: Integra Real Estate, LLC

**Assets:** Debtor AHP is selling the following asset: all right, title and interest of Seller in the assemblage of land located at 3601 N. Miami Avenue, in Miami-Dade County, Florida as more particularly described on Exhibit "A" attached to the Contract (the "Property"), inclusive of any development rights previously obtained by Seller, together with all plans, drawings, as-built record drawings, transferable consents, authorizations, variances or waivers, permits, entitlements, utility rights, reservations and approvals related thereto, if any, and subject to Bankruptcy Court approval.

**Purchase Price:** The purchase price for the Property is Twenty Five Million Five Hundred Thousand and 00/100 Dollars ($25,500,000.00) (the "Purchase Price"), subject to better and higher offers.

**Deposit:**   The designated closing agent under the Contract, Pardo Jackson Gainsburg, PL, 200 S.E. First Street, Suite 700, Miami, Florida 33131 (the "Closing Agent").  The Buyer shall deposit Two Hundred and Fifty Thousand and 00/100 Dollars ($250,000.00) (the "First Deposit") with the Closing Agent (as defined below), within three (3) business days after the Effective Date.  If Buyer does not terminate the Contract prior to the expiration of the Due Diligence Period (as defined below), then Buyer shall make a second deposit of One Million and No/100 Dollars ($1,000,000) (the "Second Deposit") (the First Deposit and Second Deposit are collectively referred to herein as the "Deposit") with the Closing Agent (as defined below) no later than three (3) business days following the expiration of the Due Diligence Period (as defined below).

**Closing:**   The Closing shall take place upon entry of an order of the Bankruptcy Court approving this Contract and sale of the Property, but in no event later than September 15, 2021.  At the Closing, Seller shall deliver to Purchaser a Statutory Warranty Deed and such other instruments of transfer and conveyance as provided in the Contract.

**Due Diligence:**   Buyer shall have the right, at its sole cost and expense, to conduct such investigations, studies, analyses, surveys, searches, interviews and tests as Buyer shall deem necessary or appropriate to evaluate the suitability of the Property for Buyer's intended use (collectively, the "Inspections").  Buyer shall have until the end of the date that is thirty (30) days after the Effective Date of this Contract (the "Due Diligence Period") to determine, in its sole discretion, whether the Contract is suitable for Buyer's intended use.  If Buyer determines, for any reason, that the Property is not suitable for Buyer's intended use, then Buyer shall have the right to terminate this Contract before the expiration of the Due Diligence Period by delivering written notice to Seller, in which case, the Deposit shall be returned to Buyer, and the Parties shall have no further obligations to one another except those that expressly survive termination of this

8

Contract.  If Buyer fails to terminate this Contract before the expiration of the Due Diligence Period, then Buyer will be deemed to have waived such termination right, the Deposit shall become non-refundable to Buyer (except where otherwise provided in this Contract), and the Parties shall proceed to Closing in accordance with the terms and conditions of this Contract.  In such event, Buyer shall accept the Property in its as "AS IS" condition, except as otherwise provided in this Contract.

**B.      The Contract, Sale Process and Bidding Procedures.**

20.      The Debtors submit that the terms of the Contract were: (i) negotiated at arm's length with Integra, who was represented by competent and experienced counsel; (ii) are fair and reasonable and (iii) suitable for a transaction of this nature.  Accordingly, the Debtors seeks approval of the Contract and for the Contract to serve as the form purchase contract in the event prospective bidders seek to participate in the final and absolute auction process described below.

21.      To ensure that the Debtors are able to derive maximum value from the Property, the Debtors negotiated with Integra and preserved the right to solicit higher and better offers for the Property, as provided below.

22.      The Debtors seek to accept the highest and/or best offer for the Property as determined and approved by the Bankruptcy Court.  In the event that Integra terminates the Contract prior to the Due Diligence Deadline, the Debtors will nevertheless proceed to an absolute auction sale in accordance with the following Bidding Procedures.  Accordingly, the Debtors seeks approval and implementation of the following bidding procedures (the "Bidding Procedures"):

     i.      competing bid(s) shall be made upon substantially similar terms and provisions as contained in the Contract and as otherwise provided in the order(s) of the Bankruptcy Court approving the Motion and Bidding Procedures as set forth herein, provided however, that such competing bids shall not contain a Due Diligence Period ("Competing Bid(s)");

ii.      Competing Bid(s) shall be received, in writing, by Debtor's counsel **Jesus M. Suarez, Esq., 100 SE Second Street, 44th Floor, Miami, Florida 33301, jsuarez@gjb-law.com**, by 5:00 p.m., two (2) calendar days prior to the Sale Hearing (to be set by the Bankruptcy Court) (the "Bid Deadline"), in the form of a fully executed, substantially similar version of the Contract (the "Competing Bid Contract"), along with: (a) a refundable deposit in the amount of ten percent (10%) of the purchase price identified in the Competing Bid Contract (the "Competing Bid Deposit") in readily available funds delivered to the Closing Agent (wire transfer instructions shall be provided by the Closing Agent and/or Debtors' counsel upon written request directed to jsuarez@gjb-law.com); provided however, that in the event that the Competing Bid is accepted and approved as the highest and best offer, such Competing Bid Deposit shall be non-refundable; (b) the Competing Bid shall not be subject to any contingency whatsoever, shall be subject to Bankruptcy Court approval, and shall be accompanied by evidence that the prospective buyer submitting the Competing Bid has the ability to consummate the purchase transaction and comply with all terms thereto; and (c) information that indicates to the Debtor, in the Debtor's discretion, and subject to Bankruptcy Court approval, that the prospective buyer's Competing Bid is submitted as a good faith, arm's length transaction entitled to the protections of §363(m) of the Bankruptcy Code;

iii.      the Debtors, in their discretion in consultation with Secured Creditor, and subject to Bankruptcy Court approval, shall determine whether any Competing Bid(s) received by the Bid Deadline constitute a qualified bid with capacity to close as provided in the respective Competing Bid Contract and may be accepted as a qualified bid (the "Qualified Bid");

iv.      Integra shall be deemed to have submitted a Qualified Bid provided that, at the time of the auction sale, the Due Diligence Deadline has expired, Integra has not terminated the Contract, and Integra has otherwise complied with its obligations thereunder. Secured Creditor LV Midtown shall be deemed a Qualified Bidder and may submit a Qualified Bid in an amount not to exceed their 363(k) Bid (as defined below) in the amount of the Release Price without the necessity of otherwise complying with these Bid Procedures;

v.      should the Debtors receive multiple Qualified Bids by the Bid Deadline, the Bankruptcy Court shall conduct the Sale Hearing as a final and absolute auction, at which time the Bankruptcy Court will determine the best and highest offer for sale of the Property (the "Auction"). The Auction shall be conducted at the United States Bankruptcy Court, 301 N. Miami Avenue, Courtroom 4, Miami, Florida 33131, on the date of the Sale Hearing or as soon thereafter as the Bankruptcy Court may be available;

vi.    any prospective buyers with a Qualified Bid (the "Qualified Bidder(s)") shall be permitted to participate in the Auction. The minimum bidding increments above the highest and best Qualified Bid accepted at the time of the Auction, shall be not less than two-hundred fifty thousand dollars ($250,000.00) (the "Bid Increment(s)");

vii.    the competitive bidding among the Qualified Bidders shall continue until the Bankruptcy Court determines it has received the highest and/or best bid for the Property (the "Successful Bidder");

viii.    the Qualified Bidder submitting the second highest Qualified Bid accepted at the Auction, if any, shall be deemed the back-up bidder (the "Back-Up Bidder") and shall be obligated to close on the transaction contemplated under the purchase Contract submitted for approval with such Qualified Bid within seven (7) days from the tendering of written notice by the Debtors to the Back-Up Bidder of the Successful Bidder's failure to close and the Competing Bid Deposit of the Back-Up Bidder shall be non-refundable if Back-Up Bidder is called upon to close on its Qualified Bid and fails to do so; and

ix.    notwithstanding the above Bidding Procedures, in the event that Integra or another Qualified Bidder(s) is not deemed to be the Successful Bidder or Back-Up Bidder at the Auction, then all Deposits or Additional Deposits shall be refunded by the Debtors or Closing Agent (collectively, the "Refundable Deposit(s)") to the respective party submitting the Refundable Deposit, within five (5) business days of the Auction or upon further order of the Bankruptcy Court, and Secured Creditor LV Midtown may exercise its Qualified Bid in an amount not up to the amount 363(k) Bid (as defined below) and shall be the Successful Bidder.

23.    The foregoing procedures attempt to create a final competitive sale process to achieve the highest and/or best offer for the Property, while assuring that a final sale of the Property occurs in accordance of the terms of the LV Settlement.

24.    Notwithstanding the above Bidding Procedures, Secured Creditor shall have the right, but not the obligation, to credit bid the amount of the Release Price pursuant to §363(k) of the Bankruptcy Code in connection with the sale of the Property pursuant to this Motion (the "**363(k) Bid**").  Pursuant to the LV Settlement, the 363(k) Bid is not subject to objection.  In the event that Secured Creditor exercises its 363(k) Bid option, such bid shall be subject to the Bidding Procedures outlined herein and any order(s) approving this Motion, except that Secured

Creditor shall not be required to submit a Deposit or Additional Deposit for purposes of bidding at the Auction nor shall Secured Creditor be required to submit a Competing Bid in advance of the auction.

      **C.**      **Form and Manner of Notice of Bidding Procedures and Sale.**

      25.      Pursuant to Bankruptcy Rule 6004(a), notice of the proposed sale of the Property outside the ordinary course of business is to be provided in accordance with Bankruptcy Rule 2002(a)(2), (c)(1), and (k). These provisions of Bankruptcy Rule 2002 provide that all creditors are to receive at least twenty-one (21) days' notice of a sale of estate assets outside the ordinary course of business, unless the Bankruptcy Court, for cause, shortens the time or directs another method for providing notice. Fed. R. Bankr. P. 2002(a)(2).

      26.      Bankruptcy Rule 2002(c)(1) provides that the notice of the proposed sale of assets is to include a general description of the assets, the time and place of any public sale, the terms and conditions of any private sale and the time fixed for filing objections. Upon obtaining a date and time for the Sale Hearing and/or Auction from the Bankruptcy Court at the Approval Hearing, the Debtors shall submit a proposed Order outlining the requirements set forth in Bankruptcy Rule 2002(c)(1).

      27.      With respect to Bankruptcy Rule 6004-1(B)(6), the Debtors do not maintain personally identifiable information and thus does not have a policy of prohibiting the transfer of personally identifiable information. To that end, the Debtors do not believe a consumer privacy ombudsman is required under §332 of the Bankruptcy Code.

V.    **AUTHORITY FOR RELIEF.**

A.    **The Bankruptcy Code Permits the Debtors to Sell the Property Outside of the Ordinary Course of Business.**

28.    Property of the estate may be sold outside the ordinary course of business. Section 363(b)(1) of the Bankruptcy Code provides, in part, that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). A debtor-in-possession or trustee may sell substantially all of its assets prior to proposal of a plan of reorganization. *In re Parkstone Med. Info. Sys.*, 2001 WL 36189822 at *1 (Bankr. S.D. Fla. Oct. 16, 2001) (Hyman, J.); *In re Lionel Corporation*, 722 F.2d 1063, 1070-71 (2d Cir. 1983). Courts have held that transactions should be approved under §363(b)(1) of the Bankruptcy Code when: (a) they are supported by the sound business judgment of the debtor's management or the trustee; (b) interested parties are provided with adequate and reasonable notice; (c) the sale price is fair and reasonable; and (d) the purchaser is acting in good faith. *See, e.g, Meyers v. Martin (In re Martin)*, 933 F.3d 513, 515 (7th Cir. 1991); *In re Abbott Dairies of Penn, Inc.*, 788 F.2d 143 (3d Cir. 1986); *Comm. of Equity Sec. Holders v. Lionel Corp.* (*In re Lionel Corp.*), 722 F.2d 1063, 1071 (2d Cir. 1983); *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169 (D. Del. 1991); *In re Phoenix Steel Corp.*, 82 B.R. 334, 335-36 (D. Del. 1987); *In re General Motors Corp.*, 407 B.R. 463, 498 Bankr. S.D.N.Y. 2009); *In re Chrysler LLC*, 405 B.R. 84, 94 (Bankr. S.D.N.Y. 2009).  Here, each of these factors is met.

29.    The Debtors, in the sound exercise of their business judgment, concluded that the sale of the Property pursuant to the terms and conditions of the Contract presents the best option for maximizing the value of the Property and satisfying, in part, its debts owed to Secured Creditor and to creditors of the Estate.  Selling the Property will permit the Debtors to realize the value of the Property and eliminate accruing interest, taxes and administrative expense.

30.    To date, the Contract submitted by Integra is the best purchase offer the Debtors received for the purchase of the Property.  In order to ensure the highest possible return for the Debtors' estates and creditors, AHP has conditioned its obligation to proceed under the Contract on the Debtor's ability to receive higher and/or better offers through a competitive Auction, appropriate and in the best interest of Debtor's creditors.  In addition, the Debtors have protected the Estates by ensuring that, in the event that Integra terminates the Contract before the Due Diligence Deadline, an absolute auction sale will nevertheless occur resulting in the final disposition of the Property to a party submitting a Competing Bid or to Secured Creditor through the exercise of its 363(k) Bid.

31.    Accordingly, the Debtors respectfully submit that ample business justification exists for the sale of the Property pursuant to the sale process proposed in this Motion.

**B.    The Sale of the Property Will be Free and Clear of Liens, Claims, and Encumbrances.**

32.    Pursuant to §363(f) of the Bankruptcy Code, the Debtors will sell the Property free and clear of all liens, claims, liabilities, encumbrances and other interests. Any liens will attach to the proceeds of the sale. This Court has the statutory authority to authorize the sale free and clear of liens. Pursuant to §363(f) of the Bankruptcy Code, the Debtors may sell all or any part of property of the estate pursuant to §363(b) or (c), free and clear of any and all liens, claims, liabilities, encumbrances, or other interests, if:

> (i)  applicable non-bankruptcy law permits sale of such property free and clear of such interest;
> (ii) each entity holding a lien, claim or interest consents;
> (iii)such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
> (iv)such interest is in bona fide dispute; or
> (v) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f); *In re Smart World Tech., LLC*, 423 F.3d 166, 169 n. 3 (2d Cir. 2005); *In re*

*Elliot*, 94 B.R. 343, 345 (E.D. Pa. 1988) (determining § 363(f) is written in the disjunctive; the court may approve a sale "free and clear" provided at least one of the subsections is met).  The Property is subject to (i) the first mortgage lien held by Secured Creditor LV Midtown and (ii) the disputed second mortgage lien held by QR Triptych, which is the subject of the Avoidance Litigation. See, ¶10, *supra*.  The proposed sale of the Property under the Contract to Integra as set forth in this Motion satisfies the Debtors' obligations to Secured Creditor pursuant to the LV Settlement and provides a meaningful recovery to the Debtors' general unsecured creditors, thereby meeting the requirements of §363(f)(ii) of the Bankruptcy Code.

33.     As a result, the Debtors propose to sell the Property free and clear of all successor liability claims, in addition to liens, claims and encumbrances.  *See e.g.*, *In re Trans World Airlines, Inc.*, 322 F.3d 283, 288-90 (3d Cir. 2003); *In re Chrysler, LLC*, 576 F.3d 108, 126 (2d Cir. 2009); *Am. Living Sys. V. Bonapfel (In re All Am. Of Ashburn, Inc.)*, 56 B.R. 186, 189-90 (Bankr. N.D. Ga. 1986), *aff'd* 805 F.2d 1515 (11th Cir. 1986).

**C.     Integra is Entitled to the Protections Afforded by 11 U.S.C. §363(m) because the Proposed Sale is in Good Faith.**

34.     Section 363(m) of the Bankruptcy Code provides that reversal or modification on appeal of a transaction authorized under §363(b) does not affect the validity of the sale to an entity that acquired the property in good faith. *See* 11 U.S.C. § 363(m); *In re Stadium Management Corp.*, 895 F.2d 845 (1st Cir. 1990); *In re Adamson Co., Inc.*, 159 F.3d 896 (4th Cir. 1998).

35.     Although the Bankruptcy Code does not define good faith, courts have recognized that the kind of misconduct that would destroy a good faith status involves fraud, collusion between purchasers and other offerors, or an attempt to grossly take advantage of other offerors. *In re Abbott Dairies of Pa., Inc.*, 788 F.2d at 147; *In re Gucci*, 126 F.3d 380, 390 (2d Cir. 1997).

36.     AHP and Integra negotiated the Contract and the transaction contemplated in this Motion in good faith.  Integra is not an affiliate or insider of the Debtors, nor is it in any way related to the Debtors.  Accordingly, the Debtors request the Order approving the sale to Integra, should it be the purchaser of the Property, or the Successful Bidder, contain a finding that Integra or the Successful Bidder is a good-faith purchaser entitled to the protections of §363(m).

**D.     The Bidding Procedures are Appropriate and Will Maximize the Value Received for the Property.**

37.     Courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy sales. *See, e.g., In re Montgomery Ward Holding Corp.*, Case No. 97-1409 (PJW) (Bankr. D. Del. Aug. 6, 1997); *In re Integrated Resources, Inc.*, 147 B.R. 650, 659 (S.D.N.Y. 1992); *In re Financial News Network, Inc.*, 126 B.R. 152, 156 (Bankr. S.D.N.Y. 1991) (stating "court-imposed rules for the disposition of assets … [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estates.").

38.     The proposed Bidding Procedures will allow the Debtors to conduct the Auction in a controlled, fair and open fashion that will encourage participation by financially capable bidders, thereby increasing the likelihood they will receive the best possible consideration for the Property. They also allow the Debtors to undertake the Auction process in as expeditious a manner as possible, which the Debtors believe is essential to maintaining and maximizing the value of their Estates.

39.     The Debtors believe that the Bidding Procedures will encourage bidding for the Property and are appropriate under the relevant standards governing auction proceedings and bidding incentives in bankruptcy proceedings. *See Integrated Resources*, 147 B.R. at 659; *In re*

*995 Fifth Avenue Assocs.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989).

**WHEREFORE**, the Debtors, AVENTURA HOTEL PROPERTIES, LLC ("AHP") and TRIPTYCH MIAMI HOLDINGS, LLC respectfully request the Bankruptcy Court set an Approval Hearing on the Motion, and enter an Order: (i) authorizing AHP to sell the Property free and clear of all liens, claims and encumbrances, pursuant to 11 U.S.C. §363; (ii) approving the Contract, subject to better and higher offers; (iii) approving the Bidding Procedures and sale process; (iv) setting a Sale Hearing and/or Auction date on or before August 23, 2021, or as soon as possible as the Court's schedule permits; and (v) granting such other and further relief as is just and proper.

Dated this 15th day of July, 2021.

Respectfully submitted,

GENOVESE JOBLOVE & BATTISTA, P.A.
*Counsel to the Debtors-in-Possession*
100 S.E. 2nd Street, Suite 4400
Miami, FL 33131
Tel.: (305) 349-2300
Fax.: (305) 349-2310

By:/s/  Jesus M. Suarez
      John H. Genovese, Esq.
      Fla. Bar No. 280852
      jgenovese@gjb-law.com
      Jesus M. Suarez, Esq.
      Fla. Bar No. 60086
      jsuarez@gjb-law.com

# EXHIBIT A

## CONTRACT FOR "AS IS" SALE AND PURCHASE OF VACANT LAND

FOR AND IN CONSIDERATION of the mutual benefits accruing and expected to accrue hereunder **Aventura Hotel Properties, LLC** , a Florida limited liability company and Chapter 11 Debtor in Possession, whose mailing address is 1001 SW 2nd Avenue, Suite 300, Miami, Florida 33127 (hereinafter "Seller") and **Integra Real Estate, LLC,** a Florida limited liability company, whose mailing address is 150 SE Second Avenue, Suite 800, Miami, Florida 33131 (hereinafter called "Buyer"), enter into this Contract For "As Is" Sale And Purchase of Vacant Land (the "Contract") and intend to be legally bound by the terms and conditions hereinafter set forth. The effective date of this contract shall be July 15, 2021, the date of execution of this Contract by the Buyer (the "Effective Date").

ONE. **PROPERTY**:  Seller agrees to sell and Buyer agrees to buy all that certain assemblage of land, including all right, title and interest of Seller in the assemblage of land located at 3601 N. Miami Avenue, in Miami-Dade County, Florida as more particularly described on **Exhibit "A"** attached hereto and made a part hereof (the "Property"), inclusive of any development rights previously obtained by Seller, together with all plans, drawings, as-built record drawings, transferable consents, authorizations, variances or waivers, permits, entitlements, utility rights, reservations and approvals related thereto, if any, and subject to Bankruptcy Court approval.

TWO. **PURCHASE PRICE AND DEPOSIT**:  The purchase price for the Property is Twenty-Five Million Five Hundred Thousand DOLLARS ($25,500,000.00) (the "Purchase Price"), which shall be paid at closing by indefeasible payment made by wire transfer (the "Closing").   The Closing shall take place upon entry of an order of the Bankruptcy Court approving this Contract and sale of the Property but in no event later than September 15, 2021. The Buyer shall deposit Two Hundred and Fifty Thousand and 00/100 Dollars ($250,000.00) (the "First Deposit") with the Closing Agent (as defined below), within three (3) business days after the Effective Date.  If Buyer does not terminate the Contract prior to the expiration of the Due Diligence Period (as defined below), then Buyer shall make a second deposit of One Million and No/100 Dollars ($1,000,000) (the "Second Deposit") (the First Deposit and Second Deposit are collectively referred to herein as the "Deposit") with the Closing Agent (as defined below) no later than three (3) days following the expiration of the Due Diligence Period (as defined below). Subject to the terms of the Contract, the Second Deposit, along with the First Deposit, shall then

become non-refundable in accordance with the terms of this Contract. The First Deposit and Second Deposit shall be delivered to Seller and applied as a credit against the Purchase Price at Closing.

       **THREE**.  **INSPECTIONS.**  Buyer shall have the right, at its sole cost and expense, to conduct such investigations, studies, analyses, surveys, searches, interviews and tests as Buyer shall deem necessary or appropriate to evaluate the suitability of the Property for Buyer's intended use (collectively, the **"Inspections"**), and Seller hereby grants Buyer and Buyer's Agents the right to enter the Property for purposes of completing its Inspections.  Buyer shall have until the end of the date that is thirty (30) days after the Effective Date of this Contract (the **"Due Diligence Period"**) to determine, in its sole discretion, whether the Contract is suitable for Buyer's intended use.  If Buyer determines, for any reason, that the Property is not suitable for Buyer's intended use, then Buyer shall have the right to terminate this Contract before the expiration of the Due Diligence Period by delivering written notice to Seller, in which case, the Deposit shall be returned to Buyer, and the Parties shall have no further obligations to one another except those that expressly survive termination of this Contract.  If Buyer fails to terminate this Contract before the expiration of the Due Diligence Period, then Buyer will be deemed to have waived such termination right, the Deposit shall become non-refundable to Buyer (except where otherwise provided in this Contract), and the Parties shall proceed to Closing in accordance with the terms and conditions of this Contract.  In such event, Buyer shall accept the Property in its as "AS IS" condition, except as otherwise provided in this Contract.

       **FOUR.**  **BUYER INDEMNIFICATION.**  To the extent that Buyer or its employees, agents or contractors (collectively, **"Buyer's Agents"**) conduct Inspections, Buyer agrees (i) to repair all damage to the Property caused by Buyer or Buyer's Agents, (ii) not to permit any mechanics', materialman's or other liens to attach to the Property as a result of Inspections carried out by Buyer or Buyer's Agents, and if such liens do attach, then Buyer shall, at its sole cost and expense, remove or bond over the same within fifteen (15) days after notice of same, and (iii) to indemnify, defend and hold the Seller harmless from and against all losses, costs, expenses, liabilities, claims and damages, including reasonable attorneys' fees actually incurred (collectively **"Losses"**) suffered by the Seller and caused by the negligent actions or willful misconduct of Buyer or Buyer's Agents in conducting Inspections of the Property; provided, however, that this Section shall not apply to (y) Losses caused by the negligence or willful

misconduct of Seller, or its employees, agents or contractors, and/or (z) Losses caused by the discovery of defects (including violations of law and/or the release of Hazardous Substances (as hereinafter defined) not introduced by Buyer or Buyer's Agents).    The term, "Legal Requirements", shall mean all applicable federal, state, county, city, municipal and local laws, statutes, ordinances, regulations, requirements, orders and directives of any Governmental Authority.  The term "Governmental Authority" shall mean all applicable federal, state, county, city, municipal and local governmental bodies, boards, agencies, courts, regulators, or other instrumentalities having jurisdiction over the parties and/or the Property.  Buyer (or Buyer's agents) shall maintain comprehensive public liability insurance with broad form contractual and personal injury liability endorsements with respect to the Property and Buyer's and Buyer's agents' activities carried on therein, and with such insurance carriers having an A.M. Best's Key Rating Guide Rating of "A-" and a financial category of VII or better and naming Seller as an additional insured (at the option of Seller), including a waiver of defenses of the insurer based on the actions or inaction of Buyer.  Such liability insurance shall provide coverages of not less than $1,000,000.00 for injury or death to any one person and $2,000,000.00 for injury or death to more than one person and $500,000.00 with respect to property damage.

FIVE. **BANKRUPTCY COURT APPROVAL**: Notwithstanding anything contained herein to the contrary, it is expressly agreed and acknowledged by the Seller and Buyer, that this Contract is an "As Is/Where Is" purchase agreement, and contingent upon the Seller receiving Bankruptcy Court approval for this transaction. The Seller will seek approval of this Contract with the United States Bankruptcy Court for the Southern District of Florida (the "Bankruptcy Court") in the matter of *In re Aventura Hotel Properties, LLC* Bankruptcy Case No. Case No. 21-12374-BKC-RAM (the "Bankruptcy Case") upon a duly filed motion and/or plan of reorganization or liquidation seeking the approval of the Contract, which shall be noticed for hearing in the Bankruptcy Court under 11 U.S.C. §363 of the Bankruptcy Code, and as provided by the Bankruptcy Rules and the Local Rules. The Purchase Price shall remain open subject to higher and better offers and subject to the Seller receiving the necessary Bankruptcy Court approval (the "Court Approval") authorizing the Seller to enter into and perform under this Contract. The Court Approval shall provide the Seller with an order or judgment containing a finding by the Bankruptcy Court authorizing the Seller to sell the interests of the Seller free and clear of all liens, encumbrances and other interests in the Property under 11 U.S.C. §363 of the

United States Bankruptcy Code. The Court Approval shall further provide for Seller and give Seller the authority to (i) sell the Property; and (ii) sell the Property for the proposed Purchase Price stated herein or the highest and best offer. If Seller is not able to reach an agreement or Court Approval is not granted, the Contract shall be deemed null and void and cancelled, all deposits shall be returned to Buyer, and all parties shall be held harmless. Jurisdiction and venue shall remain with the Bankruptcy Court with respect to any and all matters relating to the enforcement of this Contract.

      **SIX.** **SURVEY**:  Seller authorizes Buyer, at Buyer's expense, to secure the services of a registered land surveyor (the "Surveyor") to enter upon and survey the Property in order to determine the exact dimensions thereof and to prepare a legal description to be used in the deed of conveyance (the "Survey"). The Survey shall be completed prior to the expiration of the Due Diligence Period. If the Survey discloses a material variation from the description contained in Exhibit "A" hereto, or if any easements, encroachments or conditions upon the Property or any other matter disclosed by said Survey, in the sole opinion of Buyer, would prevent Buyer from developing the Property in accordance with Buyer's plans and specifications, Buyer shall, within five (5) days of the date of completion of the Survey or the expiration of the Due Diligence Period, whichever is earlier, either (i) cancel the Contract and receive back its Deposit, and Buyer and Seller shall be released from any liability under this Contract, or (ii) accept the Property as disclosed by the Survey and proceed to Closing as described herein. If Buyer fails to notify Seller in writing of its election to cancel the Contract within five (5) days from the date of completion of the Survey or the expiration of the Due Diligence Period, Buyer shall be deemed to have accepted the Property as disclosed by the Survey.

      **SEVEN.** **TITLE**:  The Property shall be conveyed by statutory warranty deed (the "Deed") executed by Seller, free and clear of all liens, claims and encumbrances as provided under 11 U.S.C. §363 of the Bankruptcy Code and subject to Court Approval as provided in this Contract; provided however, that any easements, restrictions and encumbrances of record in Exhibit "B" attached hereto shall be subject to the provisions of this Contract; provided, however, that Buyer shall be permitted to raise as title objections (within ten (10) days of Buyer being notified thereof) of new matters affecting title of which Buyer receives notice.  If Buyer timely and properly objects to any such other item, then same shall be treated in the same manner as a title defect which, if not cured, shall entitle Buyer to terminate the Contract and the return of

its Deposit.  Additionally, if any municipal violation is issued after the expiration of the Due Diligence Period, then, if not cured prior to Closing, Buyer shall have the option to either (i) proceed to Closing, or (ii) terminate the Contract by delivering written notice to Seller and receive back its Deposit.  On or prior to the expiration of the Due Diligence Period, Buyer shall notify Seller as to which contracts, if any, Buyer will assume and which contracts shall be terminated by Seller (hereinafter, the "Unassumed Contracts") at Closing (to the extent Seller is able to terminate such contracts prior to Closing); and, Seller shall terminate all Unassumed Contracts prior to Closing.  If Seller is unable to terminate any Unassumed Contracts, then Buyer may terminate this Agreement by delivering written notice to Seller; and, upon delivery of such notice, the Closing Agent is authorized and directed to return the Deposit to Buyer.  Title examination fees shall be paid by Buyer and the premium for title insurance in the amount of the Purchase Price shall be paid by Buyer at Closing.  The Buyer acknowledges and accepts that title shall be subject to and Buyer assumes permitted exceptions as set forth in **Exhibit B.**  Any objection to title shall be made prior to the expiration of the Due Diligence Period or is otherwise deemed waived.

EIGHT. **TAXES/UTILITIES**:  At or prior to Closing, Seller shall pay all prior years' ad valorem and non ad valorem taxes owed on the Property.  All real estate taxes (other than transfer taxes) for the 2021 calendar year and water, sewer and other utility charges shall be prorated as of the date of transfer of title to Buyer. To the extent any special assessments exist that must be satisfied prior to or in connection with the Closing in order for the Closing Agent to deliver a title policy to Buyer, such special assessments shall be paid, discharged or satisfied from the proceeds of the Purchase Price at Closing. All applicable transfer taxes shall be paid by Seller at Closing.

NINE. **COMMISSIONS**:  Seller shall pay any real estate broker commission due as a result of this sale in accordance with the listing agreement executed by and between the Seller and Avison Young – Florida, LLC, and approved by the Order Granting Application to Employ John K. Crotty of Avison Young - Florida, LLC as Exclusive Real Estate Sales Broker Effective as of April 26, 2021 [ECF No. 53] dated June 4, 2021in the Bankruptcy Case.  Subject to the foregoing, the parties each represent and warrant to the other that no real estate broker(s), salesman (salesmen) or finder(s) have been involved in this transaction.

TEN. **POSSESSION**:  Seller shall deliver possession of the Property at Closing upon

transfer of title to Buyer.

**ELEVEN. <u>CLOSING</u>**:  The Closing shall be consummated on the date set forth in in this Contract, through Pardo Jackson Gainsburg, PL, 200 S.E. First Street, Suite 700, Miami, Florida 33131, as closing agent (the "Closing Agent"), unless the terms and conditions of this Contract have not been satisfied.

**TWELVE.    <u>ASSIGNMENT</u>**:  Buyer may not assign its right, title and interest under this Contract.   Notwithstanding the foregoing to the contrary, Seller hereby consents to an assignment at or prior to Closing by Buyer of Buyer's interest in this Contract to an affiliate or related company which is controlled by, or under common control with, Buyer, provided that such affiliate or related company shall assume, in writing (by execution of an assignment and assumption agreement), all of Buyer's obligations under this Contract.   In the event of an assignment, Buyer shall not be relieved of its obligations under this Contract.

**THIRTEEN.   <u>REPRESENTATIONS AND WARRANTIES</u>**:

(a)      Seller represents and warrants, to the best of its knowledge, the following:

(i)      The Property is being sold strictly in "AS IS / WHERE IS" condition with right of inspections. The Seller shall make no repairs and repairs are not a condition to the sale. The Seller does not make or give any warranties expressed or implied, it is the sole responsibility of Buyer to perform all inspections and due diligence Buyer deems necessary for the purchase of the Property. This clause shall survive the Closing or any termination of the Contract.

(ii)      Seller is a limited liability corporation validly existing, organized and in good standing under the laws of the State of Florida and duly authorized to do business in the State of Florida. Seller has (i) the power, right and authority to enter into and perform all of the obligations required of Seller under this Contract and the instruments and documents referenced herein, and to consummate the transaction contemplated hereby, subject to Court Approval and (ii) taken all requisite action and obtained all requisite consents, releases and permissions in connection with entering into this Contract and the instruments and documents referenced herein or required under any covenant, agreement, encumbrance, law or regulation with respect to the obligations required hereunder, subject to Court Approval.

(iii)      This Contract is, and all agreements, instruments and documents to be executed and delivered by Seller pursuant to this Contract shall be, duly authorized, executed and delivered by Seller, subject to Court Approval.  This Contract is, and all agreements, instruments and documents to be executed and delivered by Seller pursuant to this Contract shall be, valid and legally binding upon Seller and enforceable in accordance with their respective terms, subject to Court Approval. Neither the execution

of this Contract nor the consummation of the transactions contemplated hereby does now constitute or shall result in a breach of, or a default under, any agreement, document, instrument or other obligation to which Seller is a party or by which Seller may be bound.

(iv)    All work that has been performed, or labor or materials supplied, at or on the Property, or in connection with the construction, maintenance, rehabilitation or alteration of the Property or any of the Improvements, including any claim for payment of any of the same or the right to place a lien against the Property by any contractor, subcontractor or other party, if any, shall be satisfied, paid, or otherwise discharged at or prior to Closing, to the extent required for the Closing Agent to issue a title policy to Buyer.

(v)    Seller is a "United States Person" within the meaning of Section 1445(f)(3) of the Internal Revenue Code amended.

(vi)    To Seller's knowledge, there are no condemnation, zoning or other land-use regulation proceedings, either instituted, or planned to be instituted, with respect to the Property which would adversely affect the use and operation of the Property for its intended purpose or the value of the Property, nor has Seller received notice of any special assessment proceedings affecting the Property.

(vii)    Except to the extent disclosed to Buyer in writing or in the materials made available to Buyer for its review prior to the date hereof, Seller has not received written notice of any proposed special assessments which would affect the Property.

(viii)    Seller has not received written notice from any Governmental Authority having jurisdiction over the Property stating that the Property is in violation of, any permit, zoning, building, fire or health code or other applicable law which remains uncured.

(ix)    Seller has not received written notice from any Governmental Authority having jurisdiction over the Property stating that the Property is in violation of any Environmental Law which remains uncured.  As used herein, "Environmental Law" means, collectively, (1) the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended ("CERCLA") (41 U.S.C. § 9601 et seq.) the Resource Conservation and Recovery Act, 42 U.S.C. § § 6901 et seq. ("RCRA"), and the Toxic Substances Control Act, as amended ("TSCA") (15 U.S.C. § 2601 et seq.); and (2) any other federal, state or local laws, ordinances, statutes, codes, rules, regulations, orders or decrees now or hereinafter in effect relating to (A) pollution, (B) the protection or regulation of human health, natural resources or the environment, (C) the treatment, storage or disposal of Hazardous Materials, or (D) the emission, discharge, release or threatened release of Hazardous Materials into the environment.  As used herein, "Hazardous Materials" means, collectively, any chemical, waste, or other material that is or contains (1) any "hazardous substance" as now or hereafter defined in § 101(14) of CERCLA or any regulations promulgated under CERCLA; (2) any "hazardous" or "toxic" waste as now or hereafter defined in RCRA or any regulations promulgated under RCRA; (3) any substance now or hereafter regulated by TSCA or any regulations, rule,

order or requirement promulgated under TSCA; (4) petroleum, petroleum by products, gasoline, diesel fuel, or other petroleum hydrocarbons; (5) asbestos and asbestos-containing material in any form, whether friable or non-friable; (6) polychlorinated byphenyls; or (7) lead and lead-containing products.  Except for any above-ground storage tanks which serve as the fuel system for the Property, there are no storage tanks located on the Property.

(x)    The agreements attached hereto as **Exhibit "C"** are the only leases, service contracts, licenses or occupancy agreements currently in effect with respect to the Property and Seller has provided a true and complete copy of each to Buyer.  Seller has not sent a default notice to any such contract party which remains uncured. Seller has not received written notice from any such contract party of a default by Seller under any such contract which default by Seller remains uncured.

(xi)    Seller has good and marketable title to the Property, and no person (other than Buyer to this Contract) has a right or option to acquire the Property or any direct or indirect interest in the Property.

(b)    Buyer represents and warrants the following:

(i)    Buyer is a limited liability company validly existing and organized under and by virtue of the laws of the State of Florida. Buyer has the power, financing right and authority to enter into and perform all of the obligations required of Buyer under this Contract and the instruments and documents referenced herein.

(ii)    This Contract is, and all agreements, instruments and documents to be executed and delivered by Buyer pursuant to this Contract shall be, duly authorized, executed and delivered by Buyer. This Contract is, and all agreements, instruments and documents to be executed and delivered by Buyer pursuant to this Contract shall be, valid and legally binding upon Buyer and enforceable in accordance with their respective terms.

(iii)    No petition in bankruptcy (voluntary or otherwise), assignment for the benefit of creditors, or petition seeking reorganization or arrangement or other action under Federal or state bankruptcy law is pending against or, to the best of Buyer's knowledge, contemplated by Buyer.

(iv)    Neither the execution of this Contract nor the consummation of the transactions contemplated hereby does now constitute or shall result in a breach of, or a default under, any agreement, document, instrument or other obligation to which Buyer is a party or by which Buyer may be bound, or any law, statute, ordinance, rule, governmental regulation or any writ, injunction, order or decree of any court or governmental body, applicable to Buyer or to the Property.

(c)    The provisions of the Section shall survive Closing.

**FOURTEEN.  <u>CONDITIONS PRECEDENT TO CLOSING</u>**:

(a)     The obligation of Buyer to consummate the acquisition of the Property hereunder is subject to the satisfaction of each of the following conditions precedent (collectively, the "Conditions Precedent"):

(i)     Representations and warranties of Seller contained in this Contract shall be true, complete and accurate, in all material respects, on and as of the date hereof and the Closing as if the same were made or re-made on and as of Closing;

(ii)     Title to the Property shall be as described in this Contract;

(iii)     Seller shall have performed each and every material obligation and covenant of Seller to be performed hereunder except to the extent waived by Buyer in writing;

(iv)     Seller shall deliver at the Closing the following *original* executed documents to the Closing Agent:

a.   The Deed;

b.   An assignment and assumption of contracts, if applicable;

c.   An "Owner's Affidavit", in form reasonably acceptable to Buyer and sufficient for the Closing Agent to delete any exceptions for (a) mechanics' or materialmen's liens arising from work at the Property which is the responsibility of Seller hereunder, and (b) parties in possession, other than tenants as tenants only;

d.   A gap affidavit, in a form reasonably acceptable to Buyer and Closing Agent;

e.   A certificate pursuant to the Foreign Investment in Real Property Tax Act in standard form

f.   A signed settlement statement setting forth the payments, debits and credits to occur at Closing, including the Purchase Price, the Deposit and the Closing prorations referenced above;

g.   A certificate dated as of the Closing Date certifying that all of the Seller's representations and warranties set forth in this Contract remain true, correct and complete in all respects as when first made hereunder;

h.   An assignment of any intangible personal property contemplated under this Contract;

i.   Such resolutions in form and content as the Closing Agent may reasonably request evidencing Seller's existence, power and authority

to enter into and execute this Contract and to consummate the transactions herein contemplated; and

j.   All other documents reasonably necessary or otherwise required by Buyer or Closing Agent to consummate the transactions contemplated by this Agreement.

(b)    The obligation of Seller to consummate the sale of the Property herewith is subject to the satisfaction of each of the following conditions precedent:

(i)    Representations and warranties of Buyer contained in this Contract shall be true, complete and accurate, in all material respects, on and as of the date hereof and the Closing as if the same were made or re-made on and as of the Closing;

(ii)    Buyer shall have performed each and every material obligation and covenant of Buyer to be performed hereunder except to the extent waived by Seller in writing.

**FIFTEEN. <u>SELLER'S AGREEMENTS PRIOR TO CLOSING</u>:**

For the period from the Effective Date to the earlier of (i) termination of the Contract by either party; or (ii) Closing, Seller shall:

(a) Provide to Buyer, immediately upon the receipt thereof, any and all notices in any manner relating to the Property received by Seller or its agents or representatives from any governmental or quasi-governmental instrumentality, insurance company or from any other entity or party.

(b) Take all actions necessary to comply with all of the Entitlements, Easements and all other agreements, covenants, encumbrances and obligations affecting or relating to the Property. Seller shall pay (or cause to be paid) all utility bills, tax bills and other invoices and expenses relating to the Property, as and when the same become due or the amount thereof shall be credited to Buyer against the Purchase Price at Closing, to the extent required to complete the Closing.

(c) Not, without the prior written consent of Buyer, except for purposes of filing the Contract with the Bankruptcy Court for Bankruptcy Court approval and providing notice of sale of the Property to all interested parties in the Bankruptcy Case pursuant to the Bankruptcy Code, disclose or provide a copy of this Contract, or any part hereof, or any of the agreements, covenants or transactions contained herein, or delivered in connection herewith, to any third party (other than to Seller's professional advisors, management agents, or to others as Seller may be required by process of law).

(d) Not, without the prior written consent of Buyer, enter into, renew or amend any contracts, leases, licenses or other agreements in respect of the Property.

(e) Not, without the prior written consent of Buyer, grant or record any easement, permit, right of way, encumbrance or other interest of any kind affecting the Property.

(f) Not knowingly discharge, disburse, release, dispose of, or allow to escape or migrate, on or from the Property, any hazardous materials (hereinafter defined).

(g) Not, without the prior written consent of Buyer, file, consent or support any application to change the zoning classification of the Property.

(h) Provide to Buyer all correspondence, filings, reports and other documentation submitted to or received from governmental authorities after the Effective Date relating to tanks or other environmental conditions on the Property.

**SIXTEEN. BREACH OF CONTRACT**:

(a)    By SELLER:   In the event the purchase and sale hereunder is not closed by reason of Seller's default hereunder, the parties hereto agree that upon Seller's failure to cure such default within fifteen (15) days of receipt of written notice of such default from Buyer, Buyer shall be entitled to return of the Deposit. In no event shall Buyer have the right, and Buyer hereby waives the right to, and in no event shall Seller be liable for, any special, incidental, exemplary and consequential damages, including, but not limited to, the loss of profits or revenue, interference with business operations, or loss of tenants, lenders, investors, or buyers, or inability to use the Property.

(b)    By BUYER:   In the event the purchase and sale hereunder is not closed by reason of Buyer's default hereunder, the parties agree that upon Buyer's failure to cure such default within ten (10) days of receipt of written notice from Seller and without further authorization or signature from Buyer, the Closing Agent shall deliver the Deposit to Seller, as full liquidated damages for Buyer's default. In no event shall Seller have the right and Seller hereby waives the right to sue for specific performance, and in no event shall Buyer be liable for any special, incidental, exemplary and consequential damages, including, but not limited to, the loss of profits or revenue, interference with business operations, or loss of tenants, lenders, investors, or buyers, or inability to sell the Property. The parties hereto expressly acknowledge that it is impossible to estimate more precisely the damages to be suffered by Seller upon Buyer's default, and that the Deposit is intended not as a penalty, but as full liquidated damages. In the event the purchase and sale contemplated in the Contract is not consummated because of Buyer's default, Buyer hereby waives and releases any right to (and hereby covenants that it shall not) sue Seller to recover the amount set forth or any part thereof on the grounds that it is unreasonable in amount or is a penalty and not agreed upon and reasonable liquidated damages.

**SEVENTEEN. NOTICES**:   Any notice or communication required or permitted under this Contract must be in writing. Such notice will be deemed validly given for all purposes when delivered by electronic mail, when deposited in registered or certified United States mail, return receipt requested, or overnight delivery service, addressed to the party for whom such notice is intended, at the following addresses:

    (a)     if to Seller:

Aventura Hotel Properties, LLC
c/o Francisco Arocha
1001 SW 2nd Avenue, Suite 300,
Miami, Florida 33126
farocha@hesgroup.com

with a copy to:

Genovese Joblove & Battista, P.A.
c/o Jesus M. Suarez
100 SE Second Street, 44th Floor
Miami, Florida 33133
jsuarez@gjb-law.com

    (b)     if to Buyer:

Integra Real Estate, LLC
   150 S.E. 2nd Avenue, Suite 800
Miami, FL 33131
vb@integrafl.com

    (c)     if to Closing Agent:

Pardo Jackson Gainsburg, PL
200 S.E. First Street, Suite 700
Miami, FL 33131
mpardo@pardojackson.com

**EIGHTEEN.  MERGER**:  This Contract supersedes all prior negotiations and understandings between the parties and constitutes the entire Contract with respect to the purchase and sale of the Property. The Contract shall be binding upon Seller and Buyer and their respective successors and assigns; provided, Seller may not assign its interest under this Contract except with the written consent of Buyer.

**NINETEEN. SECTION HEADINGS**:  The section headings in this Contract are for the purpose of convenience only and shall in no way be held to explain, modify or aid in the interpretation, construction or the meaning of the provisions herein.

**TWENTY. TERMINATION – DEPOSIT**:  If this Contract is canceled in accordance with the provisions hereof, Seller shall return the Deposit to Buyer, and Seller and Buyer shall be released from any obligation or liability to the other under this Contract.

**TWENTY ONE. <u>DISPUTES</u>**:  Any dispute under this agreement shall be subject to the exclusive jurisdiction of the United States District Court for the Southern District of Florida ("Miami Division") with any disputes to be resolved in the Bankruptcy Case (as defined in this Contract) with the prevailing party to be entitled to an award of reasonable attorney's fees.

**TWENTY TWO. <u>ESCROW</u>**:  The Deposit shall be held in escrow by the Closing Agent upon the following terms:

(a)    The Deposit shall be delivered to the Closing Agent and shall be held by the Closing Agent until the Closing or sooner termination of this Agreement.  Closing Agent shall deliver or apply the Deposit in accordance with the terms of this section.

(b)    At the Closing, the Deposit shall be paid by Closing Agent to Seller.  If, for any reason, the Closing does not occur and either party makes a written demand upon Closing Agent for payment of such amount, Closing Agent shall give written notice to the other party of such demand.  If Closing Agent does not receive a written objection from the other party to the proposed payment within one (1) business day after the giving of such notice, Closing Agent is hereby authorized to make such payment.  If Closing Agent does receive such written objection within such one (1) business day period, or if for any other reason the Closing Agent in good faith shall elect not to make such payment, Closing Agent shall continue to hold such amount until otherwise directed by joint written instructions from Seller and Buyer or by a non-appealable final order from a court of competent jurisdiction.  However, Closing Agent shall have the right at any time to deposit the Deposit and the interest accrued thereon, if any, with the clerk of the court having jurisdiction in the county in which the Property is located.  Closing Agent shall give written notice of such deposit to Seller and Buyer and, upon such deposit, Closing Agent shall be relieved and discharged of all further obligations hereunder.

(c)    Buyer and Seller agree that:

(i)    the duties of the Closing Agent are only as herein specifically provided, and, except for the provisions of subsection (d) hereof, are purely ministerial in nature, and the Closing Agent shall incur no liability whatever except for Closing Agent's willful misconduct or gross negligence, as long as the Closing Agent has acted in good faith;

(ii)    the Closing Agent shall not be liable or responsible for the collection of the proceeds of the check (if paid by check) representing the Deposit;

(iii)    in the performance of its duties hereof, the Closing Agent shall be entitled to rely upon any document, instrument or signature reasonably believed by Closing Agent to be genuine and signed by either Seller or Buyer or its successors;

(iv)    the Closing Agent may assume that any person purporting to give any notice of instructions in accordance with the provisions hereof has been duly authorized to do so;

(v)    except as provided in subsection (d) hereof, and except for any loss, liability, costs or expenses arising as a result of Closing Agent's willful misconduct or gross negligence, Seller and Buyer each hereby indemnifies the Closing Agent for, and holds it harmless against, any and all loss, liability, costs or expenses, including, without limitation, reasonable attorneys' fees incurred by Closing Agent in serving as Closing Agent hereunder and in faithfully discharging its duties and obligations hereunder;

(vi)    Seller and Buyer each hereby releases the Closing Agent from any act done or omitted to be done by the Closing Agent in good faith in the performance of its duties hereunder.

(d)    The Closing Agent is acting as a stakeholder only with respect to the Deposit. If there is any dispute as to whether the Closing Agent is obligated to deliver the Deposit or as to whom said Deposit is to be delivered, the Closing Agent shall not be required to make any delivery, but in such event the Closing Agent may hold the same until receipt by the Closing Agent of an authorization in writing, signed by all of the parties having any interest in such dispute, directing the disposition of the Deposit and any interest accrued thereon, or in the absence of such authorization the Closing Agent may hold the Deposit and any interest accrued thereon until the final determination of the rights of the parties in an appropriate proceeding. If such written authorization is not given, or proceedings for such determination are not begun within thirty (30) days of the date set forth herein for the Closing and diligently continued, the Closing Agent may, but is not required to, bring an appropriate action or proceeding for leave to deliver the Deposit and any interest accrued thereon to a Florida state court of competent jurisdiction, pending such determination. The Closing Agent shall be reimbursed for all costs and expenses of such action or proceeding including, without limitation, reasonable attorneys' fees and disbursements at all tribunal levels, by the party determined not to be entitled to the Deposit, or if the Deposit is split between the parties hereto, such costs of the Closing Agent shall be split, pro rata, between Seller and Purchaser, based upon the amount of the Deposit received by each. Upon making delivery of the Deposit in the manner provided in this Agreement, the Closing Agent shall have no further liability hereunder.

(e)    Closing Agent shall have the right, but not the obligation, to invest the Deposit in an interest-bearing account with a financial institution approved by Closing Agent conditioned upon receiving an appropriate W-9 form from Buyer. Closing Agent shall not be liable for any losses suffered in connection with any such investment and shall have no obligation to obtain the best, or otherwise seek to maximize the rate of interest earned on any such investment. Any fees or charges in connection with such investment shall be paid out of the amounts held in escrow before any other payments shall be required to be made from such amounts.

(f)    Upon any delivery of the amount remaining in escrow as provided herein, Closing Agent shall be relieved of all liability, responsibility or obligation with respect to or

arising out of the escrow or under this Agreement.  Closing Agent shall not be bound by any modification to this Section unless Closing Agent shall have agreed to such modification in writing.

(g)     The Closing Agent has executed this Agreement solely to confirm that the Closing Agent shall be receiving funds constituting the Deposit (subject to collection) and will hold the Deposit, in escrow, pursuant to the provisions of this Agreement.

(h)     Closing Agent shall be entitled to retain attorneys of its choice, including an affiliate of Closing Agent, in connection with this escrow and Closing Agent may continue to represent Buyer in connection with this Agreement, or any dispute which may arise hereunder or otherwise.  Seller hereby acknowledges and consents to the foregoing and, to the fullest extent permitted by law, waives any objection to Closing Agent, or any law firm related thereto, representing Buyer in any dispute related to this Agreement.

[*End of Contract– Signature Page Follows*]

[*Signature Page to Contract*]

**Witnesses:**

_____

_____

**AVENTURA HOTEL PROPERTIES,
LLC, as Debtor in Possession**

By: _____ Francisco Arocha

Title: _____ MANAGER

Executed by Seller this 15th day of July, 2021.

**Integra Real Estate, LLC**

_____

_____

By: _____

Title: _____

Executed by Buyer this 15th day of July, 2021.

[*Signature Page to Contract*]

**Witnesses:**                                              **AVENTURA HOTEL PROPERTIES,**
                                                            **LLC, as Debtor in Possession**

_____                          By: _____

_____                          Title:_____

                Executed by Seller this 15th day of July, 2021.

                                                            **Integra Real Estate, LLC**

                                                            By: _____

_____                          Title:_____Manager_____

_____

                Executed by Buyer this 15th day of July, 2021.

**<u>EXHIBIT "A"</u>**

## EXHIBIT I

| Address | Owner | Color | Folio Number | Land SF | Land Acre |
|---|---|---|---|---|---|
| **Triptych Development Site — Aventura Hotel Properties LLC** | | | | | |
| 3701 N Miami Ave | Aventura Hotel Properties LLC | Blue (1) | 01-3124-026-0070 | 4,457 SF | 0.10 Acres |
| 3630 N Miami Ave | Aventura Hotel Properties LLC | Red (2) | 01-3124-026-0150 | 3,269 SF | 0.08 Acres |
| 3651 N Miami Ave | Aventura Hotel Properties LLC | Yellow (3) | 01-3124-026-0060 | 4,176 SF | 0.10 Acres |
| 3601 N Miami Ave | Aventura Hotel Properties LLC | Pink (4) | 01-3124-026-0160 | 4,877 SF | 0.11 Acres |
| 3651 N Miami Ave | Aventura Hotel Properties LLC | Green (5) | 01-3124-026-0050 | 4,533 SF | 0.10 Acres |
| 3610 N Miami Ave | Aventura Hotel Properties LLC | Light Blue (6) | 01-3124-026-0170 | 5,243 SF | 0.12 Acres |
| 3601 N Miami Ave | Aventura Hotel Properties LLC | Orange (7) | 01-3124-026-0010 | 9,198 SF | 0.21 Acres |
| 17 NE 36 ST | Aventura Hotel Properties LLC | Purple (8) | 01-3124-026-0030 | 4,500 SF | 0.10 Acres |
| 25 NE 36 ST | Aventura Hotel Properties LLC | White (9) | 01-3124-026-0040 | 4,530 SF | 0.10 Acres |
| **Total** | | | | **44,783 SF** | **1.03 Acres** |



**EXHIBIT "B"**

| | |
|---|---|
| **First American** | ALTA Commitment for Title Insurance |
| | ISSUED BY |
| **Schedule BII** | **First American Title Insurance Company** |
| | File No: 1062-4080409 |

## SCHEDULE B-II

### Exceptions

THIS COMMITMENT DOES NOT REPUBLISH ANY COVENANT, CONDITION, RESTRICTION, OR LIMITATION CONTAINED IN ANY DOCUMENT REFERRED TO IN THIS COMMITMENT TO THE EXTENT THAT THE SPECIFIC COVENANT, CONDITION, RESTRICTION, OR LIMITATION VIOLATES STATE OR FEDERAL LAW BASED ON RACE, COLOR, RELIGION, SEX, SEXUAL ORIENTATION, GENDER IDENTITY, HANDICAP, FAMILIAL STATUS, OR NATIONAL ORIGIN.

The Policy will not insure against loss or damage resulting from the terms and provisions of any lease or easement identified in Schedule A, and will include the following Exceptions unless cleared to the satisfaction of the Company:

1. Defects, liens, encumbrances, adverse claims or other matters, if any, created, first appearing in the public records or attaching subsequent to the Effective Date but prior to the date the proposed insured acquires for value of record the estate or interest or mortgage thereon covered by this Commitment.

2. Any rights, interests, or claims of parties in possession of the land not shown by the public records.

3. Any encroachment, encumbrance, violation, variation or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the land.

4. Any lien, for services, labor, or materials in connection with improvements, repairs or renovations provided before, on, or after Date of Policy, not shown by the public records.

5. Any dispute as to the boundaries caused by a change in the location of any water body within or adjacent to the land prior to Date of Policy, and any adverse claim to all or part of the land that is, at Date of Policy, or was previously under water.

6. Taxes or special assessments not shown as liens in the public records or in the records of the local tax collecting authority, at Date of Policy.

7. Any minerals or mineral rights leased, granted or retained by current or prior owners.

8. Taxes and assessments for the year 2018 and subsequent years, which are not yet due and payable.

   NOTES FOR STANDARD EXCEPTIONS: Standard Exceptions for parties in possession, for mechanics liens, and for taxes or special assessments not shown as liens in the public records shall be deleted upon receipt of an acceptable Non-Lien and Possession Affidavit establishing who is in possession of the lands, that there are no liens or encumbrances upon the lands other than as set forth in the

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance. This is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; and Schedule B, Part II-Exceptions.*

**Copyright 2006-2016 American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

Commitment, that no improvements to the lands have been made within the past 90 days or are contemplated to be made before closing that will not be paid in full, and that there are no unrecorded taxes or assessments that are not shown as existing liens in the public records. Any Policies issued hereunder may be subject to a Special Exception for matters disclosed by said affidavit.

Standard Exception(s) for questions of survey may be deleted upon receipt and review of a properly certified Survey meeting the Florida Minimum Technical Standards for all land surveys dated no more than 90 days prior to closing or such other proof as may be acceptable to the Company. Any Policies issued hereunder may be subject to a Special Exception for matters disclosed by said survey or proof.

The Standard Exception for any minerals or mineral rights leased, granted or retained by current or prior owners is hereby deleted.

9.  Dedications and Easements as shown on the Plat of CENTRAL ADDITION BUENA VISTA, recorded in Plat Book 3, Page 191.

10. Restrictions, Reservations, Easements and other matters as set forth in Special Warranty Deed recorded July 14, 1983 in O.R. Book 11846, Page 642, as affected by Notice Pursuant to Section 712.05, Florida Statutes recorded October 11, 2011 in O.R. Book 27853, Page 2163 and Agreed Order Approving Confidentiality Stipulation recorded June 14, 2012 in O.R. Book 28149, Page 649, Final Judgment for Defendants recorded September 27, 2013 in O.R. Book 28842, Page 4750. (NOTE:  License Agreement for 50 years containing a right of first refusal to purchase billboard sign and license.)

11. Terms, covenants, conditions and other matters as shown in that certain Memorandum of Lease by and between Sandra Boozer, landlord, and National Advertising Company, recorded April 4, 2000 in O.R. Book 19053, Page 2052.

12. Terms and conditions of that certain Parking Rights Agreements between Aventura Hotel Properties, LLC, a Florida limited liability company, as Servient Owner and Fifteen Midtown Properties, LLC, a Florida limited liability company, as Adjacent Owner, recorded July 9, 2014 in O.R.Book 29222, Page 2558 and O.R. Book 29222, Page 2572, which contain a Right of First Offer.

13. Agreement for Water and Sanitary Sewer Facilities between Miami-Dade County and Aventura Hotel Properties, LLC, recorded November 13, 2015 in O.R. Book 29852, Page 909, as affected by Addendum recorded in O.R. Book 30281, Page 4192.

14. Tree Permit - Removing and Planting, Covenant Running with the Land recorded August 3, 2016 in O.R. Book 30176, Page 3849.

15. Restrictions, covenants, conditions and other matters contained in that certain Declaration of Restrictive Covenant in lieu of Unity of Title recorded November 23, 2016 in O.R. Book 30319, Page 2904.

16. Terms and conditions of any existing unrecorded lease(s), and all rights of lessee(s) and any parties claiming through the lessee(s) under the lease(s).

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; and Schedule B, Part II-Exceptions.*

**Copyright 2006-2016 American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

**Note:** All of the recording information contained herein refers to the Public Records of Miami-Dade County, Florida, unless otherwise indicated. Any reference herein to a Book and Page or Instrument Number is a reference to the Official Record Books of said county, unless indicated to the contrary.

Searched by:  Jim Mcginley/ - (954)495-1548 - JMcginley@firstam.com

---

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; and Schedule B, Part II-Exceptions.*

**Copyright 2006-2016 American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

| Form 5030012 (5-16-17) | Page 10 of 14 | ALTA Commitment for Title Insurance (8-1-16) with Florida Modifications Florida |

**EXHIBIT "C"**

Record and Return to:
Fowler Rodriguez
355 Alhambra Circle
Suite 801
Coral Gables, Florida 33134

CFN 2014R0482495
OR Bk 29222 Pgs 2558 - 2571; (14pgs)
RECORDED 07/09/2014 12:38:28
HARVEY RUVIN, CLERK OF COURT
MIAMI-DADE COUNTY, FLORIDA

Prepared by and Return to: (enclose self-addressed stamped envelope)

Name:    Scott J. Fuerst, Esq.

Address: Greenspoon Marder, P.A.
         200 East Broward Blvd., Suite 1800
         Fort Lauderdale, Florida 33301

SPACE ABOVE THIS LINE FOR PROCESSING DATA                SPACE    ABOVE    THIS    LINE    FOR
PROCESSING DATA

## PARKING RIGHTS AGREEMENT

THIS PARKING RIGHTS AGREEMENT ("**Agreement**") is executed this 7 day of July, 2014, by and between **AVENTURA HOTEL PROPERTIES, LLC**, a Florida limited liability company ("**Servient Owner**") and **FIFTEEN MIDTOWN PROPERTIES LLC**, a Florida limited liability company (referred to herein as "**Adjacent Owner**").

## W I T N E S S E T H :

WHEREAS, Servient Owner is the owner of certain real property lying and situate in Miami-Dade County, Florida, more particularly described on **Exhibit A** attached hereto and made a part hereof (the **Servient Parcel**"), having purchased the Servient Parcel from Adjacent Owner; and

WHERAS, Adjacent Owner is the owner of certain real property lying and situate in Miami-Dade County, Florida more particularly described on **Exhibit B** attached hereto and made a part hereof (the "**Adjacent Parcel**"), which is adjacent to the Servient Parcel; and

WHEREAS, Adjacent Owner has previously used portions of the Servient Parcel for parking serving the Adjacent Parcel and desires to continue such use; and



WHEREAS, Servient Owner agrees to allow Adjacent Owner to continue to use portions of the Servient Parcel for parking on the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of TEN DOLLARS ($10.00) and other good and valuable consideration, the receipt, adequacy and sufficiency of which is hereby acknowledged, the parties intending to be legally bound, do hereby agree as follows:

Parking Rights Agreement
Fifteen Midtown
17183082:4

14

1.     Recitations; Definition:   The foregoing recitations are true and correct and are incorporated herein by this reference. As used in this Agreement, "exclusive" shall mean to the exclusion of all others.

2.     Easements:   Servient Owner hereby grants to Adjacent Owner and Adjacent Owner's successors in interest, invitees, customers, employees, tenants and subtenants and the invitees, employees and customers of such tenants and subtenants (all of the foregoing are collectively the "**Adjacent Owner Parties**"), the following easements for the benefit of the Adjacent Parcel upon the terms and conditions set forth herein (collectively "**Easements**"):

2.1     Ingress and Egress.   A perpetual, non-exclusive easement in, over, across and upon the streets, access roads, driveways, drive isles and sidewalks located on the Servient Parcel, as same may exist from time to time, for purposes of providing pedestrian and vehicular ingress and egress to and from the Adjacent Parcel and the parking areas now and hereafter located upon the Servient Parcel, as same may exist from time to time ("**Access Easement**").

2.2     Parking Easement.   A perpetual, exclusive easement in, over and upon the parking areas now and hereafter located upon the Servient Parcel, as same may exist from time to time, for the purpose of providing vehicular parking as more particularly hereinafter described ("**Parking Easement**").

2.3     Limitations and Qualifications.

2.3.1     Until   such   time   as   Servient   Owner   commences   physical development of a project on the Servient Parcel (the "**Project**"), the Adjacent Owner Parties shall have the right to continue to use all of the Servient Parcel for parking in the same manner as the Adjacent Owner Parties have used it prior to conveyance of the Servient Parcel to Servient Owner.   There shall be no charge, fee or cost to any of the Adjacent Owner Parties.   The Adjacent Owner, on behalf of itself and the Adjacent Owner Parties, hereby (i) acknowledges and agrees that the use by the Adjacent Owner Parties of the parking rights set forth in this Section 2.3.1 is at the sole risk of the Adjacent Owner Parties and (ii) holds harmless the Servient Owner from any loss or damage suffered by an Adjacent Owner Party in connection with the use of the rights set forth in this Section 2.3.1 including, but not limited to, theft or damage to vehicles, with the exception of any damage to person or property resulting from the negligence or willful act of the Servient Owner or any employee, contractor or agent of Servient Owner.

2.3.2     At such time as Servient Owner commences physical development of the Project, the Adjacent Owner Parties shall have the right to continue to use such portions of the Servient Parcel for parking to the extent that such use does not materially interfere with the development by Servient Owner of the Project in Servient Owner's sole reasonable discretion. Servient Owner shall have the right to modify the location of available parking on the Servient Parcel from time to time as development of the Project progresses by notifying Adjacent Owner thereof in order that there is no material interference with such Project or potential damage to any Adjacent Owner Parties utilizing the Easements or their property.   There shall be no charge, fee or cost to any of the Adjacent Owner Parties for such use.   The Adjacent Owner, on behalf of



2

itself and the Adjacent Owner Parties, hereby (i) acknowledges and agrees that the use by the Adjacent Owner Parties of the parking rights set forth in this Section 2.3.2 is at the sole risk of the Adjacent Owner Parties and (ii) holds harmless the Servient Owner from any loss or damage suffered by an Adjacent Owner Party in connection with the use of the rights set forth in this Section 2.3.2 including, but not limited to, theft or damage to vehicles, with the exception of any damage to person or property resulting from the negligence or willful act of the Servient Owner or any employee, contractor or agent of Servient Owner.

        2.3.3    After completion of construction of the Project, the Adjacent Owner Parties shall have the exclusive perpetual right to use ten (10) self-park parking spaces located on the first level of parking in a parking garage on the Servient Parcel (the "**Designated Spaces**"). The Adjacent Owner Parties shall have twenty-four hour access to the Designated Spaces, every day of the year without charge therefor (except for the "Parking Fee" hereinafter described). The location of the Designated Spaces shall be determined by mutual agreement of Servient Owner and Adjacent Owner, which location the parties shall in good faith negotiate during such time as a site plan for development of the Project has been sufficiently prepared to be able to make such determination. The agreed location shall be memorialized by an amendment to this Agreement ("**Amendment**") which shall have attached thereto a site plan showing the specific location of the Designated Spaces. Such amendment shall be recorded in the Official Records of Miami-Dade County. The Designated Spaces shall be equal to the highest/best category of spaces in the garage and shall be generally located so as to provide maximum convenience for the users thereof to access Northeast Miami Court (which is located between the Servient Parcel and the Adjacent Parcel) and shall have identification on each space that same is reserved for use by the Adjacent Owner Parties. The specific language of such identification shall be as reasonably determined by Adjacent Owner. Further, Adjacent Owner shall have the right to cause any vehicles which are improperly parked in the Designated Spaces to be towed (and the identification referred to above may contain appropriate towing warning information) by such towing company as Servient Owner retains to otherwise serve the Servient Parcel and the Servient Owner shall notify the towing company that certain named representatives of the Adjacent Owner (as designated by Adjacent Owner) are authorized to contact the towing company directly to initiate towing service.

        In consideration for the perpetual, exclusive right to use the Designated Spaces, Adjacent Owner agrees to pay Servient Owner an amount (the "**Parking Fee**") to be determined as follows:

        (a)    At any time prior to completion of construction of the Project, either party hereto may propose the amount and payment terms of the Parking Fee to the other party. In the event the parties reach agreement on the Parking Fee (which neither party shall be obligated to do), then the amount and terms shall be incorporated into the Amendment. 

        (b)    In the event the parties do not reach agreement on the amount and payment terms of the Parking Fee, then the determination shall be made as follows: each of the parties, within ten (10) days of notice from the other party that an impasse has been reached in determining the Parking Fee, shall select a licensed commercial real estate broker having at least

Parking Rights Agreement
Fifteen Midtown
17183082:4

five (5) years experience in the development and/or purchase and sale of multi-story commercial projects in Miami-Dade County. Each party shall notify the other of the identity of the selected broker. Each broker shall, within thirty (30) days after selection, provide a written opinion of the "fair market value" of the Designated Spaces based upon the prevailing market conditions and the proposed site plan of the Project. The fair market value shall be expressed on a monthly basis. In the event the fair market value determined by the brokers is within ten percent (10%) of one another, then the average of the two shall be the Parking Fee. In the event the fair market value determined by the brokers is not within ten percent (10%) of one another, then the two brokers shall mutually select a third qualified broker and the Parking Fee shall be the average of the valuation of the third broker and the valuation of the other broker whose valuation is closest to that of the third broker. Each party hereto shall pay the cost of the broker selected by it and shall split the cost of the third broker if applicable. The Parking Fee so determined by this method shall remain in effect for a period of five (5) years. At the end of such five (5) year period, if the parties have not otherwise agreed upon a new Parking Fee, then the Parking Fee shall be reset each year using the foregoing method of determination by the brokers if the parties do not otherwise agree on the Parking Fee for the forthcoming year on or before thirty (30) days before the commencement of the next year. Notwithstanding the foregoing, if at any time Servient Owner offers to lease parking spaces in the garage to the general public for less than the then applicable Parking Fee, then the Parking Fee shall be automatically reduced to the equivalent amount being offered to the general public and shall remain at such rate for a period of at least one (1) year (subject to further reduction in the event of a reduction in the price offered to the general public). This "most favored nation" provision shall be applicable to the Designated Spaces on an ongoing basis.

The Parking Fee shall be payable monthly in advance unless the parties hereto agree otherwise and shall commence on the date that the Project receives a final certificate of occupancy.

3.    Easement Terms.

3.1    Maintenance. The Servient Owner shall maintain all roads, driveways, entranceways, walkways, sidewalks and parking spaces on the Servient Parcel in a state of good repair at all times so as to give effect to the benefits of this Agreement including, without limitation, all cleaning, re-surfacing, replacing, striping, repairing of pavement and curbing and replacing of directional signs and identification signs for the Designated Spaces. Notwithstanding and independent of this obligation of Servient Owner to maintain the Servient Parcel, during the period prior to the commencement of physical development of the Project, Adjacent Owner shall have the right, at its expense, to perform such maintenance and make such reasonable upgrades and improvements to the Servient Parcel as are designed to facilitate parking thereon by Adjacent Owner Parties (for example only and not in limitation thereof, providing an asphalt surface where there is none). Any such work shall be performed at the sole cost of Adjacent Owner and Adjacent Owner shall hold harmless and indemnify Servient Owner against any damage, loss, claim or injury to persons or property arising in connection with such work. 

4

3.2    Obstructions.  During the term of this Agreement, subject to complying with the requirements of applicable governmental authorities, the Servient Owner shall not, nor allow anyone else to, construct curbs, walkways, berms, landscaping, dividers, medians, signage or any barriers on the Servient Parcel which would interfere with the Easements granted by this Agreement.  Nothing contained herein shall be construed to in any way limit or restrict the right of the Servient Owner to make improvements (or modifications, relocations or reconfigurations) to the Servient Parcel from time to time or modify the Project without any consent of or notice to the Adjacent Owner, provided no such improvements (or modifications, relocations or reconfigurations) shall materially interfere with vehicular ingress and egress in, on, over, across and upon the Servient Parcel or the location of the Designated Spaces.

3.3    Traffic Control - Temporary and Partial Closure.  In connection with the construction and/or maintenance of the Project, Servient Owner may temporarily close portions of the roadways, driveways, entranceways, walkways or sidewalks within the Servient Parcel; provided, however, that the work shall be accomplished with diligence and continuity and with adequate traffic control so as to keep any interruptions to a minimum.  Further, temporary closure is permitted to the extent legally necessary and for the minimum time to prevent any claim that this Agreement was intended to create any easement rights for the benefit of the public.  Prior to temporarily closing any portion of the Servient Parcel as provided in the preceding sentence, Servient Owner shall provide Adjacent Owner with not less than five (5) days prior written notice of the date of such closure and expected duration of such closure.

4.    Right of First Offer:  In the event that Servient Owner desires at any time to lease, license or otherwise grant parking rights with respect to spaces in a parking garage on the Servient Parcel to the general public, then prior to entering to any such lease license or rights, Servient Owner shall grant to Adjacent Owner the right and option to lease or license such spaces on the terms and conditions as shall be specified by Adjacent Owner in an offer from Adjacent Owner to Servient Owner (**"Offering Notice"**).  Servient Owner may accept the offer as set forth in the Offering Notice by notice to Adjacent Owner (**"Acceptance Notice"**) given within thirty (30) days after receipt by Servient Owner of the Offering Notice.  In the event Servient Owner timely delivers the Acceptance Notice, then the parties shall proceed to execute within five days (5) days thereafter a modification to the Amendment identifying the additional parking spaces described in the Offering Notice, which spaces shall thereafter be deemed Designated Spaces and subject to the same provisions as all other Designated Spaces with the exception of the Parking Fee which, as to such new Designated Spaces, shall be as set forth in the Offering Notice.  If the Servient Owner does not timely accept such offer by delivering the Acceptance Notice, then Servient Owner shall thereafter have the right for a period of six (6) months to enter into leases, licenses or other grants of rights to parking spaces in the garage on terms no less favorable than as set forth in the Offering Notice.  If any such leases, licenses or other grants of rights are not entered into within such six (6) month period, then this right of first opportunity  shall re-attach to all parking spaces in the garage on the Servient Parcel.

5.    Default:  No party shall be deemed to be in default under this Agreement unless and until the alleged defaulting party shall have received written notice of default and shall have

failed to cure the default within ten (10) days after the receipt of such notice. If a party fails to cure its default within the time period described herein (after receiving notice as required hereby), the non-defaulting party shall have all rights and remedies available at law and/or in equity including, but not limited to, the right to seek injunctive relief and specific performance of this Agreement. It is expressly agreed that no breach of this Agreement shall entitle either party to terminate this Agreement, but such limitation shall not affect in any manner any other rights and remedies which such party may have hereunder by reason of any breach of this Agreement.

6.      <u>Binding Effect</u>:  The covenants contained in this Agreement are not personal but shall run with the land and shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, personal representatives, transferees, successors or assigns.

7.      <u>Right to Relinquish Designated Spaces</u>:  Notwithstanding any other provision of this Agreement to the contrary, the Adjacent Owner may elect at any time and from time to time, to temporarily relinquish its rights to use some or all of the Designated Spaces by providing notice thereof (the "**Relinquishment Notice**") to Servient Owner designating the effective date of relinquishment (the "**Relinquishment Date**") and the specific Designated Space(s) being relinquished (each a "**Relinquished Space**").  As of the Relinquishment Date, there shall be no further Parking Fee applicable to any Relinquished Space and Servient Owner shall have the right to lease or grant use rights to all Relinquished Spaces on a month-to month basis to any other users.  Thereafter, Adjacent Owner shall have the right, from time to time, to reinstate its rights under this Agreement to use some or all of the Relinquished Spaces by providing Servient Owner with not less than thirty (30) days notice of such intention (the "**Reinstatement Notice**") specifying those spaces to be reinstated as Designated Spaces and the effective date of such reinstatement, in which event the Parking Fee shall be applicable to the reinstated Designated Spaces as of the reinstatement date so specified.  Notwithstanding the foregoing, in the event any of the Relinquished Spaces described in a Reinstatement Notice are being used by a third party at the time set forth in such Reinstatement Notice, Servient Owner shall provide Adjacent Owner a substitute space which is as comparable to the Relinquished Space as possible (in the reasonable discretion of Servient Owner) until such time as the Relinquished Space becomes available.

8.      <u>Notices</u>:  If a party desires to give notice hereunder to the other party, such notice shall be in writing and addressed to the party for whom it is intended at the addresses set forth below.



| | |
|---|---|
| If to Servient Owner: | Aventura Hotel Properties, LLC<br>355 Alhambra Circle<br>Suite 801<br>Coral Gables, FL 33134<br>Attention: Francisco Arocha<br>Phone: (305) 854-6300<br>email: arochaf@aol.com |
| With a copy to: | Juan E. Serralles, Esq.,<br>Fowler Rodriguez<br>355 Alhambra Circle, Ste 801<br>Coral Gables, Florida 33134<br>Phone: 786-364-8415<br>Fax: 786-364-8401<br>email: jserralles@frfirm.com |
| And a copy to: | Jose Antonio Herrera, Esq.<br>Phone: (797) 786-3861<br>email: jherrera@herrera-p.com |
| If to Adjacent Owner: | Fifteen Midtown Properties LLC<br>c/o Fifteen Group<br>47 N.E. 36th Street, 2nd Floor<br>Miami, FL   33137<br>Attn:   Justin Toal<br>Phone:   (305) 938-4310<br>Fax:   (305) 571-9215<br>email: jt@fifteengroup.com |
| with a copy to: | Fifteen Midtown Properties LLC<br>c/o Fifteen Group<br>47 N.E. 36th Street, 2nd Floor<br>Miami, FL   33137<br>Attn:   Ian Sanders<br>Phone: (305) 938-4304<br>Fax:   (305) 571-9215<br>email: ian@fifteengroup.com |

All notices may be deposited in the United States mail, certified or registered mail, return receipt requested with postage prepaid, sent by Federal Express or comparable overnight mail service.  Notice shall be deemed to have been given upon receipt or refusal of delivery of said notice. 

9.    Severability.  If any provisions of this Agreement are held to be invalid, void or unenforceable, the remaining provisions of this Agreement shall not be affected or impaired and

each remaining provision shall remain in full force and effect. In the event that any term or provision of this Agreement is determined by appropriate judicial authorities to be illegal void or otherwise invalid, said provision shall be given its nearest legal meaning or be construed as deleted as such authority determines and the remainder of this Agreement shall be construed to be in full force and effect.

10.    Waiver:  No waiver of any of the provisions of this Agreement shall be effective unless it is in writing, signed by the party against whom it is asserted and any such waiver shall only be applicable to the specific instance in which it relates and shall not be deemed to be a continuing or future waiver.

11.    Governing Law:  This Agreement shall be governed by and construed in accordance with the laws of the State of Florida and venue for any litigation arising hereunder shall be Miami-Dade County, Florida.

12.    Captions:  The captions and paragraph headings contained in this Agreement are for reference and convenience only and in no way define, describe, extend or limit the scope or intent of this Agreement, nor the intent of the provisions hereto.

13.    Prevailing Party.  In the event of any litigation between the parties under this Agreement, the prevailing party shall be entitled to reasonable attorneys' fees and court costs through all trial and appellate levels and proceedings (including without limitation fees to determine fees).

14.    Waiver of Jury Trial.  THE PARTIES EACH HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT EITHER MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY AND ALL ISSUES PRESENTED IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM BROUGHT BY EITHER OF THE PARTIES HERETO AGAINST THE OTHER OR ITS SUCCESSORS OR ASSIGNS WITH RESPECT TO ANY MATTER ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT. THIS WAIVER BY THE PARTIES HERETO OF ANY RIGHT EITHER MAY HAVE TO A TRIAL BY JURY HAS BEEN NEGOTIATED AND IS AN ESSENTIAL ASPECT OF THEIR BARGAIN.

15.    Entire Agreement and Modification.  This Agreement contains and sets forth the entire understanding between Servient Owner and Adjacent Owner and it shall not be changed, modified or amended except by an instrument in writing and executed by the party against whom the enforcement of any such change, modification or amendment is sought.

16.    Joint Preparation.  The preparation of this Agreement has been a joint effort of the parties and the resulting document shall not, solely as a matter of judicial construction, be construed more severely against one of the parties than the other.

17.    Counterparts.  This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original but all of which shall constitute one and the same agreement.

8

Parking Rights Agreement
Fifteen Midtown
17183082:4

18.    <u>Right to Tow</u>.    During the period prior to the commencement of physical development of the Project, Adjacent Owner shall have the right to engage a licensed towing company to tow unauthorized vehicles from the Servient Parcel at the direction of the Adjacent Owner.  A vehicle shall be considered unauthorized if it is parked by or at the direction of anyone other than (a) an Adjacent Owner Party or (b) a principal, business invitee, employee or prospective customer of Servient Owner ("Servient Owner Parties").  Servient Owner shall provide advance or contemporaneous notice (in person, via telephone call if answered or email) to Adjacent Owner when any of the Servient Owner Parties is parking on the Servient Parcel.



[SIGNATURES ON FOLLOWING PAGES]

9

**IN WITNESS WHEREOF,** the parties hereto have hereunto set their hands and seals the day and year first above written.

Signed, sealed and delivered in the
presence of:

FIFTEEN MIDTOWN PROPERTIES LLC

By:  FG Managing Member, Inc., its
Manager

_____

Printed Name:_____

By:_____

Name: Ian Sanders

Title: Vice President

_____

Printed Name:_____

STATE OF _____        )
                              )  SS:
COUNTY OF _____       )

I HEREBY CERTIFY that on this day, before me, an officer duly authorized in the State aforesaid and in the County aforesaid to take acknowledgments, the foregoing instrument was acknowledged before me by Ian Sanders, the Vice President, of FG Managing Member, Inc., the Manager of Fifteen Midtown Properties LLC, a Florida limited liability company, freely and voluntarily under authority duly vested in him by said company. He is personally known to me or has produced _____ as identification.

WITNESS my hand and official seal in the County and State last aforesaid this ____ day of _____, 2014.

_____
Notary Public

_____
Typed, printed or stamped name of Notary Public

My Commission Expires:

10

AVENTURA HOTEL PROPERTIES, LLC,
a Florida limited liability company

By: _____
Name: Francisco Arocha, its sole Manager

Printed Name: _____

Printed Name: _____ OTTO RUIZ

STATE OF _FLORIDA_____ )
                          ) SS:
COUNTY OF _MIAMI-DADE_ )

      I HEREBY CERTIFY that on this day, before me, an officer duly authorized in the State aforesaid and in the County aforesaid to take acknowledgments, the foregoing instrument was acknowledged before me by Francisco Arocha, the sole Manager of Aventura Hotel Properties, LLC, a Florida limited liability company, freely and voluntarily under authority duly vested in him by said company. He is personally known to me or who has produced _____ as identification.

      WITNESS my hand and official seal in the County and State last aforesaid this 7th day of _July_____, 2014.

                _____
                Notary Public  CECILIA ROZ

                _____
                Typed, printed or stamped name of Notary Public

My Commission Expires:

11

**IN WITNESS WHEREOF,** the parties hereto have hereunto set their hands and seals the day and year first above written.

Signed, sealed and delivered in the
presence of:

FIFTEEN MIDTOWN PROPERTIES LLC

By:   FG Managing Member, Inc., its
Manager

By: _____
Name: Ian Sanders
Title: Vice President

Printed Name: _Chris MacConell_

Printed Name: _Steve Raide_

STATE OF _FLORIDA_        )
                          )  SS:
COUNTY OF _MIAMI-DADE_     )

I HEREBY CERTIFY that on this day, before me, an officer duly authorized in the State aforesaid and in the County aforesaid to take acknowledgments, the foregoing instrument was acknowledged before me by Ian Sanders, the Vice President, of FG Managing Member, Inc., the Manager of Fifteen Midtown Properties LLC, a Florida limited liability company, freely and voluntarily under authority duly vested in him by said company. He is personally known to me or has produced _____ as identification.

WITNESS my hand and official seal in the County and State last aforesaid this _27_ day of _JUNE_, 2014.

_____

TESSA MENCIA
MY COMMISSION #FF118448
EXPIRES May 1, 2018
(407) 398-0153    FloridaNotaryService.com

10

EXHIBIT A

Servient Parcel

PARCEL I:

Lots 1, 2, 3 & 4, Block 1 and Lots 1, 2, 13, 14, Block 2, of CENTRAL ADDITION    BUENA VISTA, according to the Plat thereof as recorded in Plat Book 3 at Page 191, of the Public Records of Miami-Dade County, Florida, less and except the following described property:

The West 15 feet of said Lots 1 & 2, Block 2; also less and except the following:

Beginning at the Northwest corner of Lot 1, Block 1, of CENTRAL ADDITION BUENA VISTA; thence run South along the West line of said Lot 1 for a distance of 100 feet to the Southwest corner of said Lot 1; thence run East along the South line of Lots 1, 2 and 3 of said Block 1 for a distance of 78 feet to the Southeast corner of said Lot 3; thence run North along the East line of said Lot 3 for a distance of 15 feet to a point; thence run West along a line 15 feet North of and parallel with the South line of said Lot 3 and 2 for a distance of 43.03 feet to a point of curve; thence run along the arc of tangential curve to the right having a radius of 20 feet through a central angle of 89 degrees 54 minutes 30 seconds for an arc distance of 31.38 feet to a point of tangency on a line 15 feet East of and parallel with the West line of said Lot 1; thence run North along a line 15 feet East of and parallel with the West line of said Lot 1 for a distance of 65.03 feet to a point on the North line of said Lot 1; thence run West along the North line of said Lot 1; thence run West along the North line of said Lot 1 for a distance of 15 feet to the Point of Beginning and less the South 15 feet of Lot 4, Block 1.

PARCEL II:

Lots 3, 4 and 12, Block 2, of CENTRAL ADDITION    BUENA VISTA, according to the Plat thereof, as recorded in Plat Book 3 at Page 191, less and except the following described property:

The West 15 feet of said Lots 3 and 4, also less and except that part of Lots 3 and 4, Block 2, CENTRAL ADDITION    BUENA VISTA, being more particularly described as follows:

Begin at the Northeast corner of said Lot 4; thence Southerly along the Easterly line of said Lots 3 and 4, a distance of 57.67 feet; thence North 82 degrees 00 minutes 33 seconds West, a distance of 87.46 feet to a point on the Westerly line of said Lot 4; thence Northerly along said Westerly line, a distance of 44.77 feet to the Northwest corner of said Lot 4; thence Easterly along the Northerly line of said Lot 4, a distance of 86.72 feet to the Point of Beginning.

12

Also less and except that part of the said Lot 12, Block 2, CENTRAL ADDITION TO BUENA VISTA, being more particularly described as follows: Begin at the Northeast corner of said Lot 12; thence Southerly along the Easterly line of said Lot 12, a distance of 21.93 feet; thence North 82 degrees 00 minutes 33 seconds West, a distance of 102.60 feet to a point on the Westerly line of said Lot 12, thence Northerly along said Westerly line; a distance of 9.67 feet to the Northwest corner of said Lot 12, thence Easterly along the Northerly line of Lot 12, a distance of 101.70 feet to the Point of Beginning.

And

Lots 5 and 6, Block 1 of "CENTRAL ADDITION ⁻⁻ BUENA VISTA", according to the Plat thereof, as recorded in Plat Book 3 at Page 191, of the Public Records of Miami- Dade County, Florida, less the South 15.00 feet for road right of way.


PARCEL III:

Lots 7 and 8, Block 1, CENTRAL ADDITION ¹ ₁ BUENA VISTA, according to the Plat thereof, as recorded in Plat Book 3 at Page 191, of the Public Records of Miami-Dade County, Florida, less the South 15.00 feet for road right of way.

13

OR BK 52872 PG 2571
LAST PAGE

## EXHIBIT B

### Adjacent Parcel

Lots 1 and 2, Block 4 of "CENTRAL ADDITION   BUENA VISTA", according to the Plat thereof, as recorded in Plat Book 3 at Page 191, of the Public Records of Miami- Dade County, Florida, less the South 15.00 feet for road right of way

14

## ESTOPPEL CERTIFICATE

THIS ESTOPPEL CERTIFICATE (this "**Certificate**"), dated as of _____
____, 2018, is executed by OUTFRONT MEDIA LLC ("**OM**"), SANDRA BOOZER ("**SB**")
and AVENTURA HOTEL PROPERTIES LLC, a Florida limited liability company ("**AHP**"),
with respect to that certain Substituted Agreement for Removal and Replacement of Billboard
(the "**Substituted Agreement**"; capitalized but undefined terms utilized herein shall have the
meaning given to such terms in the Substituted Agreement). OM, SB and AHP, for good and
valuable consideration, and intending to be legally bound, hereby certify to each other and to
AHP's lender, LV LENDING LLC, a Florida limited liability company ("**Lender**") that as of the
date hereof:

1.    A true and correct copy of the Substituted Agreement is attached hereto as Exhibit "A".

2.    The Substituted Agreement is in full force and effect and has not been modified or
amended in any respect except as reflected in the documents attached as Exhibit "A". The
Substituted Agreement, including the exhibits referenced therein (whether currently finalized and
executed or finalized and executed in the future), constitutes the entire agreement of the parties
with respect to the subject matter thereof, and supersedes any prior agreements between the
parties with respect to the subject matter thereof.

3.    Neither OM, SB nor (to the knowledge of OM and SB) AHP (except with respect to the
Outstanding Payments, as defined below), is in default under the terms of the Substituted
Agreement. OM and SB have no knowledge of any event which, but for the passage of time, the
giving of notice or both, would constitute an event of default under the Substituted Agreement by
OM, SB or AHP.

4.    OM, SB and AHP acknowledge and agree that the document attached to this Estoppel
Certificate as Exhibit "B" constitutes the Sign Relocation Area identified as Exhibit A in the
Substituted Agreement.

5.    OM, SB and AHP  acknowledge and agree that the Reaffirmation of Billboard
Reservation attached to this Estoppel Certificate as Exhibit "C" constitutes the Easement
Amendment identified as Exhibit B in the Substituted Agreement.

6.    The Sign was removed from the Property in or about January 2016 and no Replacement
Sign has been constructed on the Property as of the date of this Certificate, nor has construction
of the Replacement Sign commenced.

7.    The total amount of Downtime Rent accrued but unpaid as of May 11, 2018 was
$118,125.00, which Downtime Rent has been paid in full by AHP as of the date of execution of
this Estoppel Certificate. No additional Downtime Rent will be due or payable unless and until
AHP exercises its rights under Paragraph 7 of the Substituted Agreement to request the
temporary removal of the Replacement Sign, at which time Downtime Rent will accrue and be
payable as provided in Paragraph 12 of the Substituted Agreement.

\825908\42 - # 5175326 v5

8.    That there are no additional payments currently due from AHP under the Substituted Agreement other than Downtime Rent through May 11, 2018 in the amount of $118,125.00 (which Downtime Rent has been paid in full by AHP as of the date of execution of this Estoppel Certificate), plus any capital costs for the Replacement Sign payable by AHP under Section 13 of the Substituted Agreement.

This Certificate is being made with the understanding that AHP and Lender, are relying on such Certificate in connection with the a proposed refinancing of the Property.    This Certificate shall inure to the benefit of Purchaser, the Lender, and their respective successors and assigns, and shall be binding upon OM and SB's heirs, legal representatives, successors and assigns.

[signatures on following page]

\825908\42 - # 5175326 v5                    2

BY SIGNING BELOW, OM, SB and AHP each certify that all information stated above is accurate and correct and does not omit any material fact that would make any statement in this Certificate false or misleading.

**OM:**

OUTFRONT MEDIA LLC

Sign Here: _____  Date: 3-19-19

Print Name: Alberto Gewdschi

Title: General Manager

**SB:**

Sign Here: _Sandra Boozer_  Date: 3-7-2019

Print Name: SANDRA BOOZER

**AHP:**

AVENTURA HOTEL PROPERTIES, LLC

Sign Here: _____  Date: 07/31/308

Print Name: Francisco Aresha

Title: Manager

\825908\42 – # 5175326 v5

EXHIBIT "A"
(Copy of Substituted Agreement)

## SUBSTITUTED AGREEMENT FOR REMOVAL
## AND REPLACEMENT OF BILLBOARD

This Substituted Agreement For Removal And Replacement Of Billboard ("Substituted Agreement") is made this 13th day of March, 2018 by and between Outfront Media LLC ("OM") and Aventura Hotel Properties LLC ("AHP"), subject to the approval of and acceptance by Sandra Boozer ("Boozer").

WITNESSETH:

WHEREAS, AHP is the owner of certain real property located in Miami-Dade County, Florida commonly referred to as 3701 N. Miami Ave (the "Property"); and

WHEREAS, Boozer is the current owner and holder of certain rights to maintain, operate and access a billboard sign on the Property, which rights were reserved by Boozer in a Special Warranty Deed dated May 27, 1983 and recorded in the Public Records of Miami-Dade County, Florida at OR Book 11846, Page 642 (the "Boozer Easement"); and

WHEREAS, except as set forth below, Boozer has continuously and uninterruptedly owned, maintained and operated a billboard sign (the "Sign") on the Property since May 27, 1983 pursuant to the Boozer Easement;

WHEREAS, since October 5, 2011, the Sign has been marketed and operated by OM pursuant to a Management & Marketing Agreement between Boozer and OM (the "Management Agreement"); and

WHEREAS, AHP has plans to develop the Property (the "Project"), which development plans require the temporary removal of the Sign in order to allow certain necessary site development activities; and

WHEREAS, Boozer and OM were/are under no legal obligation to remove, relocate or alter the Sign in order to facilitate AHP's development plans for the Property, but are willing to do so in exchange for the mutual execution and delivery of this Substituted Agreement; and

WHEREAS, AHP, OM and Boozer previously entered into a certain "Agreement For Removal And Replacement Of Billboard", dated December 3, 2015 (the "Agreement"), in which they made certain provisions for removal of the Sign from the Property, replacement of the Sign with a new monopole billboard, and payment of down-time compensation by AHP to OM to compensate OM for lost advertising revenue from the Sign, which compensation shall be paid current through the date of execution of this Substituted Agreement; and

WHEREAS, in or about December 2015, AHP made written demand pursuant to the Agreement that OM remove the Sign in order to allow AHP to commence its construction activities on the Property, and OM did in fact remove the Sign in or about January 2016; and

WHEREAS, a dispute has arisen between AHP and Boozer/OM with respect to the parties' respective rights and obligations under the Agreement, and the parties wish to resolve their dispute by entering onto this Substituted Agreement; and

H 4812974 v4

WHEREAS, AHP, OM and Boozer agree and acknowledge that this Substituted Agreement is entered into in settlement of a disputed claim regarding the Parties' rights and obligations under the Agreement, and by entering into this Substituted Agreement no party either admits or concedes liability.

NOW THEREFORE, for and in consideration of the above recitals and the mutual exchange of the covenants contained herein, the receipt and sufficiency of which is hereby acknowledged, AHP, OM and Boozer do hereby agree as follows:

1. **Recitals.** The recitals set forth above express the intent of the parties and are incorporated herein as material contractual terms and not merely recitals.

2. **Boozer Approval.** OM will use its best efforts to secure Boozer's approval of and joinder in this Substituted Agreement, which approval and joinder shall be evidenced by Boozer's signature on the last page hereof. All obligations imposed on the parties under this Substituted Agreement are expressly contingent upon securing said approval and joinder, and this Substituted Agreement shall be ineffective and void absent such approval and joinder.

3. **Novation.** Upon execution of this Substituted Agreement by all Parties, this Substituted Agreement shall replace the Agreement in all respects, and the provisions of the Agreement shall no longer be of any force or effect. Notwithstanding the foregoing, it is expressly understood and agreed that Downtime Compensation provided for under the Agreement shall be pro-rated through the date of execution of this Substituted Agreement, and shall be paid in full by AHP no later than ten (10) days after the date the last party executes this Substituted Agreement (the "Effective Date").

4. **Construction of Replacement Sign.** Following execution of this Substituted Agreement, OM may pursue all necessary State and local permits and/or approvals necessary for the consideration and operation of a monopole billboard sign on the Property (the "Replacement Sign"). Upon its receipt of all such permits and/or approvals, OM may construct the Replacement Sign; provided, however, that OM shall not commence such construction until the earlier of: (i) April 8, 2018; or (ii) the date on which AHP authorizes OM in writing to commence construction; and provided, further, that if AHP receives a Construction Loan commitment from a senior lender on or before March 30, 2018, AHP shall have the right, upon written notice to OM (the "Notice Not to Construct"), to require OM not to construct the Replacement Sign, in which event OM shall not have the right to construct the Replacement Sign, and AHP shall pay Downtime Rent to OM in accordance with the last sentence of Section 12 below. AHP shall cooperate and assist OM in this process as necessary, by timely executing and delivering such forms, approvals and authorizations as may be required for OM to obtain the necessary State and local permits and/or approvals. The Replacement Sign shall be constructed within the area depicted in **Exhibit A** to this Substituted Agreement (the "Sign Relocation Area"). Pursuant to a written notice to OM given within 90 days after the date of mutual execution and delivery of this Agreement (the "Specific Location Notice"), AHP may designate the precise location within the Sign Relocation Area where the Replacement Sign must be constructed. If AHP fails to give OM such notice within such 90

I 4812974 v4

day period, OM may construct the Replacement Sign at any location within the Sign Relocation Area.

5.      **Replacement Sign.** The Replacement Sign will be a double-face, static (i.e., non-LED) monopole sign structure, with an approximate overall height of 62 feet, as measured from the ground at the base of the sign pole to the highest point of the sign structure (which will be approximately 48 feet from ground to bottom edge of the sign) (the "Minimum Sign Height"). The design and construction of the Replacement Sign will be in accordance with OM's usual and customary design and construction practices. Provided that increasing the height of the sign does not interfere with any other improvements constructed on the Property (all as determined by AHP in its sole and absolute discretion), OM may increase the height of the sign above the Minimum Sign Height if, in its sole opinion, increasing the height of the Replacement Sign will increase the visibility of a sign face(s) or otherwise be in OM's best business interest. In no event shall the overall height of the Replacement Sign exceed the standards set forth in Chapter 14-10, Florida Administrative Code. The dimensions of the sign faces on the Replacement Sign shall not exceed 14 feet high by 48 feet wide; provided, however, that at such time as the Replacement Sign is reinstalled pursuant to Paragraph 8 below, the Replacement Sign faces shall not exceed 14 feet high by 40 feet wide, unless AHP consents in writing to a width of up to 48 feet, which consent may be granted or withheld by AHP in its sole discretion.

6.      **Aesthetic Modifications To Replacement Sign.** OM will work cooperatively with AHP to design the Replacement Sign's support pole and any other visible portions of the sign structure (other than the sign faces) to include the typical silver painting with embellishments that are required of Clear Channel Communications to convert to LED signs (it being understood, however, that the Replacement Sign shall not be or be converted to an LED sign without AHP's prior written consent, which may be granted or withheld by AHP in its sole discretion), and to otherwise blend with and compliment the aesthetics of the Project; provided OM shall determine, in its sole opinion, that the aesthetic modifications requested by AHP are practical and commercially reasonable, and will not adversely affect the structural integrity of the Replacement Sign, and such aesthetic modifications will not, in OM's reasonable opinion, detract from the overall aesthetics of the Replacement Sign. OM shall be responsible for any and all costs and expenses related to the design, engineering and implementation of these modifications, and shall be solely responsible for securing any necessary governmental approvals provided, however, OM shall not be obligated to expend more than $50,000.00 in the aggregate in connection with the design, engineering and implementation of those modifications. OM shall not be obligated to implement the requested aesthetic modifications, or to delay construction, re-construction or replacement of the Replacement Sign pending the design, engineering, fabrication or approval process related to any such aesthetic alterations to the Replacement Sign. In the event that a final aesthetic plan is not approved and ready for implementation prior to construction, re-construction or replacement of the Replacement Sign, OM shall have the right to construct, re-construct or replace the Replacement Sign as a traditional monopole billboard. In that event, OM shall not be obligated to permit any aesthetic

# 48|2974 v4

modifications to the Replacement Sign unless those modifications are capable of being implemented without removal of the Replacement Sign or its supporting structure.

7.   **Temporary Removal Of The Replacement Sign.**   At such time as AHP determines is required to accommodate its construction schedule, OM will temporarily remove the Replacement Sign from the Property, in order to permit AHP to perform construction activities at or about the Replacement Sign Location. The timing of the Replacement Sign's removal will be as determined and directed by AHP according to its construction schedule, but in no event shall OM be required to remove the Replacement Sign sooner than 60 days after receipt by OM of written notice from AHP requesting same, which written notice to be effective shall include a copy of the then-current construction schedule evidencing the need for the removal of the Replacement Sign and the projected date when the Replacement Sign may be reinstalled. If OM fails to timely remove the Replacement Sign as required by this Paragraph 7, AHP is expressly authorized to remove the Replacement Sign, even absent separate express written authorization from OM, in which event OM shall, within 15 days after written demand from AHP, reimburse AHP for the costs incurred by AHP in connection with such removal of the Replacement Sign and for storage of the Replacement Sign; provided, however, in no event shall OM be responsible to AHP for more than $20,000.00 in the aggregate for such removal and storage costs. AHP expressly covenants and agrees that it will not demand removal of the Replacement Sign sooner than is commercially reasonable in order for AHP to perform the construction activities necessitating removal of the Replacement Sign. For the purpose of this Paragraph 7, it is expressly understood and agreed that the phrase "construction activities necessitating removal" means issuance of permits or approvals for site development and/or construction activities on the Property in furtherance of the Project. Upon written request from OM, AHP shall provide OM with a copy/copies of the construction schedule (as it may be updated from time to time) for the Project and, specifically, for that/those portion(s) of the Project impacting or affecting the temporary removal and/or reinstallation of the Replacement Sign.

8.   **Replacement/Reconstruction of Replacement Sign.**   OM shall not re-install the Replacement Sign until given written authorization by AHP to do so, which written authorization shall be given, or deemed given, by AHP as soon as practicable based on its construction schedule and the progress of the site development work necessitating removal of the Sign. AHP shall provide OM 60 days advance written notice advising OM when it may commence reinstallation of the Replacement Sign (the "60 Day Replacement Notice"). AHP expressly covenants and agrees that it will exercise all reasonable diligence and use its best efforts to prosecute its work on the Project in such a manner as to minimize downtime and allow OM to re-install the Replacement Sign as soon as possible following its removal. If at any time work on the Project ceases for a period of 60 days or longer, OM shall have the right to commence re-installation of the Replacement Sign, unless AHP provides reasonable, verifiable assurances to OM that the cessation of work is temporary and elects to pay, and does pay, OM Downtime Rent (as defined in Paragraph 12 below) of $20,000 per month from and after the expiration of such 60 day period until the expiration of the Downtime Period (as

# 4812974 v4

defined in Paragraph 12), subject to such Downtime Rent increases as are provided for by Paragraph 12 below. If OM does commencement re-installation of the Replacement Sign as permitted by the immediately preceding sentence, OM is hereby expressly authorized to secure all permits and approvals necessary for reinstallation of the Replacement Sign, and to reinstall the Replacement Sign at any time after the 30th day following that date work was last performed on the Project, even absent separate express written authorization from AHP. If reinstallation of the Replacement Sign is not possible or practicable at the Replacement Sign Location, OM is hereby authorized, in its sole discretion, to either (i) reconstruct the Replacement Sign at another location within the Sign Relocation Area, or (ii) demand payment by AHP of double the Downtime Rent (as defined below) until such time as reinstallation of the Replacement Sign is possible and practicable, and the Replacement Sign is actually reinstalled and operational.  Notwithstanding the foregoing, AHP acknowledges and understands that AHP may desire to incorporate the Replacement Sign in some manner into the building to be constructed by AHP on the Property.  OM shall be solely responsible for all design and engineering decisions related to the Replacement Sign, but shall reasonably cooperate with AHP and AHP's architects and general contractor to design and construct the Replacement Sign in such a manner to accommodate AHP's desire to incorporate same into the building to be constructed by AHP on the Property, and to provide any information regarding the Replacement Sign which is requested by applicable governmental authorities in connection with the design, permitting and/or construction of such building; provided, however, OM shall not be obligated to design or construct the Replacement Sign in such a manner that, in OM's reasonable opinion, materially deviates from OM's standard engineering/design criteria, or that materially increases design, engineering or construction costs. No engineering or design plans related to or affecting the Replacement Sign shall be submitted to any governmental permitting authority unless approved in advance by OM, which approval will not be unreasonably withheld or delayed. OM understands that it will be required to construct/install the foundation for the Replacement Sign before vertical construction of the building commences, but without installing the pole for the Replacement Sign.

9.    **Maintenance of FDOT Tags.**  During any time period when there is no billboard sign erected on the Property, OM is authorized to maintain the applicable FDOT permit tags on a post immediately adjacent to the FDOT right-of-way fence.  AHP expressly grants OM the right, without prior notice or demand, to access the Property during any time period when no sign is erected thereon for the purpose of servicing or replacing the FDOT permit tags.

10.    **Easement Rights.**  The Parties shall amend the Boozer Easement to the extent necessary to recognize and authorize relocation of the Boozer Easement to the Replacement Sign Location (the "Easement Amendment"), and to provide all necessary access by Boozer and OM to said location; provided, OM and Boozer shall be under no obligation to amend the Boozer Easement in any manner or fashion that will impair the rights retained by Boozer therein, or diminish the value of the Boozer Easement. The Easement Amendment shall be in the form attached hereto as **Exhibit B**. This Substituted Agreement shall not be effective or

# 4812974 v4

operative unless and until the Easement Amendment is executed by all parties, which the parties hereto expressly recognize and acknowledge to be a condition precedent to the effectiveness of this Substituted Agreement. Following execution of the Easement Amendment by all parties, OM is hereby expressly authorized to record the Easement Amendment in the official records of Miami-Dade County, Florida. OM shall be responsible for any costs incurred in connection with the drafting and recordation of the Easement Amendment.

11.    Post-Easement Lease.    As additional consideration for OM's agreement to enter into this Substituted Agreement, upon expiration of the Boozer Easement in or about July 2033, AHP and OM shall enter into a sign location lease, allowing OM to continue operating the Replacement Sign on the Property (the "AHP/OM Lease"). The term of the AHP/OM Lease shall commence immediately upon expiration of the Boozer Easement, and shall run for a term of five years. The Sign Location Lease shall be in the form attached hereto as **Exhibit C**. During the entire term of the AHP/OM Lease, OM shall pay to AHP as rent 27.5% of the gross revenue earned by the Replacement Sign.

12.    Downtime Compensation.    As additional consideration for OM's and Boozer's agreement to remove the Sign to accommodate AHP's construction plans, and in recognition that OM and Boozer are under no obligation to do so, AHP shall pay OM $18,000.00 per month (the "Downtime Rent") for each and every month between removal of the Replacement Sign and the earlier of: (a) 60 days after the date identified in the 60 Day Replacement Notice when OM is authorized to commence reinstallation of the Replacement Sign, or (b) the date on which the Replacement Sign shall be completely reconstructed, with all required permits and approvals from applicable regulatory authorities, and is capable of displaying advertising copy (the "Downtime Period"); provided, however, that if OM is required to remove the Replacement Sign, pursuant to Paragraph 7 hereof, sooner than 180 days after the earlier of: (i) the date of issuance of City building permits for the Replacement Sign; or (ii) the date of the Specific Location Notice, then the Downtime Rent shall be $30,000.00 per month during the period from the date OM is required to remove the Replacement Sign until the date that is 180 days after the earlier of: (i) the date of issuance of such City building permits; or (ii) the date of the Specific Location Notice. Furthermore, if the Downtime Period extends beyond 18 months, the monthly Downtime Rent shall increase to: (i) $20,000.00 for the period after 18 months up to 24 months; and (ii) $30,000.00 for the period after 24 months. The Downtime Rent shall be paid by AHP to OM on the first day of the Downtime Period in the case of the first month thereof, and thereafter in advance, on or before the fifth (5th) day of each month during the Downtime Period. OM shall be solely responsible for compensating Boozer during this time. The parties understand that time is of the essence with respect to payment of Downtime Rent. Downtime Rent shall be prorated for any partial month during the Downtime Period. Notwithstanding the foregoing, in the event AHP sends OM the Notice Not to Construct pursuant to Section 4 above, the Downtime Compensation shall be payable for the period commencing on the date of the mutual execution and delivery of this Substituted Agreement; provided, however, that: (i) the Downtime Rent during the first six

# 4812974 v4

months after the date of mutual execution and delivery of this Substituted Agreement shall be $15,000 per month (and thereafter shall be as specified above); and (ii) AHP shall, within five (5) days after sending the Notice Not to Construct, retroactively pay the Downtime Rent for the period from the date of mutual execution and delivery of this Substituted Agreement, through the date on which the Notice Not to Construct was sent.

13.    **Capital Cost For Replacement Sign.**  AHP and OM will split equally the capital cost for the initial construction of the Replacement Sign at the Replacement Sign Location, but in no event shall AHP be required to pay more than $75,000.00 toward such costs. Following the temporary removal provided for in Paragraph 7 above, if the Replacement Sign is able to be reinstalled at the Replacement Sign Location utilizing the existing foundation, then OM shall be fully responsible for all costs incurred in the temporary removal and reinstallation of the Replacement Sign. If, however, the Replacement Sign is not able to be reinstalled at the Replacement Sign Location utilizing the existing foundation (due to no fault of OM), thereby requiring the Replacement Sign to be completely rebuilt (including new foundation), AHP shall contribute to the capital cost of rebuilding the Replacement Sign in an amount equal to the unamortized cost of building the initial Replacement Sign at the time of its removal pursuant to Paragraph 7 above. For the purposes of this provision, AHP and OM stipulate and agree that the amortization period for the Replacement Sign shall be 24 months from the date construction of the initial Replacement Sign is completed and the Replacement Sign has received all necessary permits, approvals and authorizations for its operation.

14.    **View Easement.**  Notwithstanding anything else contained herein, during both the remaining term of the Boozer Easement and the entire term of the AHP/OM Lease, the parties expressly understand and agree that, under no circumstances, shall AHP improve or utilize the Property (or to allow the Property to be improved or utilized) in any manner, whether permanently or temporarily, that inhibits or impairs the view of the Replacement Sign's advertising copy/message(s) by vehicular traffic, or impairs or infringes upon the air/view rights reserved in the Boozer Easement. The parties expressly recognize these air/view rights as valuable property rights belonging to OM and Boozer and, as such, recognize the unique nature of such rights, the impairment of which could not be reasonably or accurately determined or quantified. As such, the parties expressly agree that in addition to seeking damages for the impairment of these air/view rights, OM and Boozer shall have the right to seek equitable relief, including specific performance, to enjoin the impairment of such rights.

15.    **Copy Restrictions.**  OM represents and warrants that the content of any advertising copy or other material installed on the Replacement Sign will comply with all applicable laws and will not compete with the core businesses operated on the Property, which shall mean and be limited to the hotel flag and the flagship retail store on the ground floor. In addition, OM shall not place advertising copy or other material on the Replacement Sign that: (a) displays the word "Stop" or "Danger"; (b) imitates official signs (such as a stop sign or interstate sign, etc.); or (c) displays adult entertainment (e.g., topless clubs, adult bookstores,

R 4812974 v4

sexually graphic materials, X-rated movies, etc.), tobacco, tattoo parlors, bail bondsmen, massage parlors, pawn shops, or other immoral, obscene, or sexually graphic material. Notwithstanding the foregoing, it is expressly understood and agreed that the foregoing copy restrictions shall not preclude E11EVEN Miami nightclub from advertising on the Replacement Sign.

16.  **Discount.**  Subject to availability, in the event AHP desires to have advertising copy relating to the Project posted on the Replacement Sign, AHP may rent space on the Replacement Sign for such advertising copy at a discounted rate equal to twenty percent (20%) off the then-applicable Rate Card for the Replacement Sign. It is expressly understood and agreed that AHP must provide OM at least 60 days advance notice of its desire to utilize the Replacement Sign, and OM shall not be obligated to remove an existing advertiser from the Replacement Sign to afford AHP the opportunity to utilize same.

17.  **Notices.**   All notices, demands, requests for approvals or other communications required or authorized to be given any either party to another shall be in writing and shall be hand-delivered or sent by registered or certified mail, postage prepaid, return receipt requested, or by a recognized overnight courier service to each party indicated below, addressed as follows:

If to AHP:

    Aventura Hotel Properties, LLC
    330 NW 29th Street
    Miami, Florida 33127
    Attn: Jose Herrera

If to Outfront:

    Outfront Media LLC
    2640 NW 17th Lane
    Pompano Beach, Florida 33064
    Attn: William Long

With copies to:

    William G. McCormick, Esq.
    GrayRobinson, P.A.
    401 E. Las Olas Boulevard
    Suite 1000
    Fort Lauderdale, Florida 33301

Notices given by courier service or by hand delivery shall be effective upon delivery and notices given by mail shall be effective on the fifth (5) business day after mailing. Refusal by any person to accept delivery of any notice delivered at the address indicated above (or as it may be changed) shall be deemed to have been an effective delivery as provided in this Section as of the date/time of such refusal. The addresses to which notices are to be sent may be changed from time to time by written notice delivered to the other parties in accordance herewith, and such notices shall be effective upon receipt. Until notice of change of address is received as to any particular party hereto, all other parties may rely upon the last address given.

# 4812974 v4

18.   **Default.** In the event any party is in default of any provision hereof, the non-defaulting party, as a condition precedent to the exercise of its remedies, shall be required to give the defaulting party or parties written notice of same pursuant to this Agreement. The defaulting party or parties shall have fifteen (15) business days from the receipt of such notice to cure the default or, if the default cannot be cured within fifteen (15) business days, to commence and diligently pursue a cure. If the defaulting party or parties timely cure the default, the default shall be deemed waived and this Agreement shall continue in full force and effect. If the defaulting party or parties do not timely cure such default, the non-defaulting party or parties shall be entitled to pursue its/their remedies available at law or equity.

19.   **Controlling Law and Venue.** This Agreement shall be construed under the laws of the State of Florida. Venue for any proceeding arising under this agreement shall be in the Eleventh Judicial Circuit in and for Miami-Dade County, Florida as to state court actions, and in the United States District Court for the Southern District of Florida as to federal court actions, to the exclusion of any other venue. The prevailing party in any dispute relating to or arising out of this Agreement, or the interpretation hereof, shall be entitled to recover from the non-prevailing party all legal fees incurred in connection therewith, both pre-suit and at all trial and appellate levels, including, but not limited to, attorney's fees, paralegal fees, court costs, expert fees and costs, travel costs and expenses for legal counsel, and all other out-of-pocket costs and expenses whatsoever, whether or not commonly recognized as a taxable costs, and further including any attorney's fees and costs incurred in establishing the amount of such award. THE PARTIES EACH HEREBY KNOWINGLY AND INTENTIONALLY WAIVE THE RIGHT TO TRIAL BY JURY OF ANY DISPUTES RELATING TO OR ARISING OUT OF THIS CONTRACT. ALL COURT ACTIONS OF ANY NATURE OR KIND SHALL BE NON-JURY.

20.   **Authority to Execute and Bind.** Each party represents and warrants that all requisite actions have been taken to authorize execution of this Substituted Agreement by the person signing on behalf of that party, and thereby bind that party to the terms and conditions of this Substituted Agreement.

21.   **Non-Waiver.** The failure of any party to promptly or continually insist upon strict performance of any term, covenant, condition or provision of this Substituted Agreement, or any Exhibit hereto, or any other agreement, instrument or document of whatever form or nature contemplated hereby by any other party or parties, shall not be deemed a waiver of any right or remedy that said party may have as a result thereof, and shall not be deemed a waiver of a subsequent default or nonperformance of such term, covenant, condition or provision.

22.   **Successors and Assigns.** The burdens of this Substituted Agreement shall be binding upon, and the benefits of this Substituted Agreement shall inure to, all successors in interest to the parties to this Substituted Agreement. Without limiting the generality of the foregoing, AHP may freely assign this Substituted Agreement in connection with the sale of the entire property, or that portion of the Property upon which the Replacement Sign is located.

23.   **Memorandum of Agreement.** Concurrently with the execution of this Substituted Agreement, or at any other time upon request of the other, AHP and OM shall execute, acknowledge and deliver to the other a short form memorandum of this Substituted Agreement for recording purposes. The party requesting recordation shall be responsible for payment of any fees or taxes applicable thereto.

# 4812974 v4

24. **Continuing Cooperation.** The parties covenant and agree that they will execute such further documents and take such further actions as may be reasonably necessary to effectuate and implement the provisions and intent of this Substituted Agreement.

25. **Construction.** The provisions of this Substituted Agreement shall not be construed in favor of or against any particular party as each party has reviewed the terms and conditions hereof and, by execution of this Agreement, acknowledges that said party has carefully considered the legal ramifications of this instrument, has consulted with legal counsel or has knowingly and willingly chosen not to do so. This Substituted Agreement has been negotiated by AHP and OM, and this Agreement, including, without limitation, the Exhibits (if any), shall not be deemed to have been prepared by any one party but, rather, by all equally.

26. **Counterparts.** This Substituted Agreement may be executed in counterparts, each of which shall be deemed an original but all of which shall constitute a single instrument.

IN WITNESS WHEREOF, the Parties enter into this Substituted Agreement as evidenced by their signatures affixed below.

AVENTURA HOTEL PROPERTIES, LLC

By: _____

Title: MANAGING PARTNER

Date: 3/16/ 2018

OUTFRONT MEDIA LLC

By: _____

Title: General Manager

Date: 3-16-18

Sandra Boozer

_____

Date: 5/11/2018

#4812974 v4

**EXHIBIT "B"**
(Sign Relocation Area)

## EXHIBIT A – Sign Relocation Area

(To Substituted Agreement For Removal And Replacement Of Billboard)



AVENTURA HOTEL PROPERTIES, LLC

By: _____

Title: _____

Date: _____

OUTFRONT MEDIA LLC

By: _____

Title: _____

Date: _____

Sandra Boozer

_____

Date: _____

\825908\42 - # 5136109 v1

EXHIBIT "C"
(Copy of Easement Amendment)

This instrument prepared by,
record and return to:

William G. McCormick, Esq.
GrayRobinson, P.A.
401 East Las Olas Boulevard
Suite 1000
Fort Lauderdale, Florida 33301

## REAFFIRMATION OF BILLBOARD RESERVATION

THIS REAFFIRMATION OF BILLBOARD RESERVATION ("Reaffirmation") is made as of the _____ day of _____, 2018, by and between Aventura Hotel Properties, LLC, a Florida limited liability company, whose address is 1001 SW 2nd Avenue, Suite 300, Miami, Florida 33130 ("Grantor"), and Sandra Boozer, an individual, whose address is P.O. Box 627, Brevard, NC 28712 ("Grantee").

### RECITALS:

A.      WHEREAS, Grantor is the current fee simple owner of that certain real property described in that certain Special Warranty Deed (the "Deed") recorded in Official Records Book 11846, Page 642, Public Records of Miami-Dade County, Florida (the "Grantor's Property").

B.      WHEREAS, Grantee is the successor-in-interest to Corky Corporation, the first party referenced in the Deed, and Grantee is the current holder of the rights reserved in the Deed to maintain, operate and access a billboard (the "Sign") on Grantor's Property (the "Billboard Rights").

C.      WHEREAS, Grantor has plans to develop Grantor's Property, which development requires the temporary removal of the Sign in order to allow certain necessary site development activities.

D.      WHEREAS, Grantor and Grantee have entered into that certain Substituted Agreement for Removal and Replacement of Billboard (the "Removal and Replacement Agreement"), which provides for, among other things, temporary removal of the Sign during a portion of the site development work, and construction of a new monopole sign (the "Replacement Sign") as soon as practicable following completion of the portion of the site development work necessitating removal of the Sign.

E.      WHEREAS, the Removal and Replacement Agreement further provides for the execution of an Easement Amendment, to be attached as Exhibit B to the Removal and Replacement Agreement, for the purpose of amending the Billboard Rights to the extent necessary to authorize and/or memorialize any relocation of the Replacement Sign necessitated by Grantor's improvements to Grantor's Property.

\825908\42 - # 4188603 v4
9/11/18 9:36 AM                                    1

NOW, THEREFORE, in consideration of $10.00 and the mutual benefits to be realized by the parties, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.    Recitals.  The above recitals are true and correct and are hereby incorporated herein by reference as material contractual terms and not merely recitals.

2.    Reaffirmation of Easements.  Grantor and Grantee hereby confirm and ratify the existence and continuation of the Billboard Rights in accordance with the terms and conditions set forth in the Deed, which rights remain in full force and effect, except as modified in the Removal and Replacement Agreement and herein with respect to configuration and location. Grantor and Grantee further confirm and agree that Exhibit A attached to this Reaffirmation accurately depicts the authorized location of the Replacement Sign on Grantor's Property, and that all of the Billboard Rights shall continue to apply to the Replacement Sign, as modified by the Removal and Replacement Agreement.

3.    Binding Effect.  This Reaffirmation shall run with the Grantor's Property and shall be binding on the successors and assigns of the parties hereto.  This Reaffirmation constitutes the entire agreement of the parties with respect to the subject matter hereof, and supersedes any prior agreements or understandings between the parties with respect to the subject matter hereof.

IN WITNESS WHEREOF, the parties hereto have executed this Reaffirmation as of the day and year first above written.

## SIGNATURES ON FOLLOWING PAGES

Signed, sealed and delivered
in our presence:

_____
(Signature of Witness #1)

_____
(Print name of Witness #1)

_____
(Signature of Witness #2)

_____
(Print name of Witness #2)

**AVENTURA HOTEL PROPERTIES, LLC,**
a Florida limited liability company,

By: _____
Name: _Francisco Arocha_
Title: _Manager_

STATE OF FLORIDA
COUNTY OF MIAMI-DADE

      The foregoing instrument was acknowledged before me this _7_ day of _July_ 2018, by _FRANCISCO AROCHA_, as _MANAGER_ of Aventura Hotel Properties, LLC, a Florida limited liability company, on behalf of the company.

_____
Signature of Notary Public

(Print Notary Name) _CECILIA ROZ_
My Commission Expires: _07|07|2021_
Commission No.: _GG 068475_
☒ Personally known, or
☐ Produced Identification
Type of Identification Produced

AFFIX NOTARY STAMP

CECILIA ROZ
NOTARY PUBLIC
STATE OF FLORIDA
Comm# GG068475
Expires 7/7/2021

\82590042 - # 4188603 v4
9/11/18 9:36 AM

3

_Raveen Wynn_
(Signature of Witness #1)

_Raveen Wynn_
(Print name of Witness #1)

_Kyle Beddingfield_
(Signature of Witness #2)

_Kyle Beddingfield_
(Print name of Witness #2)

**SANDRA BOOZER,**
an Individual.

By: _Sandra Boozer_

STATE OF NORTH CAROLINA
COUNTY OF TRANSYLVANIA

The foregoing instrument was acknowledged before me this 7 day of March, 2019, by Sandra Boozer.

_Jennifer C Orr_
Signature of Notary Public

_Jennifer C Orr_
(Print Notary Name)

My Commission Expires: 10-14-2023

Commission No.: _____

□ Personally known, or

☒ Produced Identification

Type of Identification Produced

_NCDL # 827366_

```
JENNIFER C ORR
NOTARY PUBLIC
TRANSYLVANIA COUNTY, NC
My Commission Expires 10-14-2023
```

AFFIX NOTARY STAMP

## EXHIBIT A

PERMITTED LOCATION OF BILLBOARD

[SEE ATTACHED]

